same decision. Cf. Van Meter v. United States, 2 Cir., 47 F.2d 192, where the Court seems to have assumed a meaning for Section 68 different from the one we suggest. The assumption did not affect the decision.

The plaintiff has filed a motion for leave to file a second amended petition, for the purpose of including a claim under Section 13 of the Atomic Energy Act of August 1, 1946, 60 Stat. 755, 772; 42 U.S.C.A. § 1801 et seq. In his tendered second amended petition the plaintiff alleges that his invention was useful in the utilization of fissionable material for atomic energy for a military weapon; that the plaintiff filed a claim for compensation for the infringement of his patent, which claim was denied by the Atomic Energy Commission; that he appealed to the United States Court of Appeals for the District of Columbia, which denied his appeal, Fletcher v. United States Atomic Energy Comm., 89 U.S.App.D.C. 218, 192 F.2d 29; that he petitioned the Supreme Court of the United States for a writ of certiorari and his petition was denied, 342 U.S. 914, 72 S.Ct. 361, 96 L.Ed. 684.

By his proposed second amended petition the plaintiff apparently desires to sue for compensation as if his patented device had been taken for use by the Atomic Energy Commission under Section 11 of the Atomic Energy Act. The plaintiff's patent had expired some months before the Atomic Energy Act was passed, and his invention was in the public domain. Since any person at all could have used it, the Commission could not lawfully have compensated him for its use, if the Commission had used it.

The plaintiff's motion for leave to file a second amended petition is denied. The Government's motion to dismiss the plaintiff's petition is granted, and the petition is dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER, and LITTLETON, Judges, concur.

CENTRAL EUREKA MINING COMPANY, a Corporation,

v.

The UNITED STATES.

ORO FINO CONSOLIDATED MINES, Inc.

v.

The UNITED STATES.

ALASKA–PACIFIC CONSOLIDATED MINING COMPANY

v.

The UNITED STATES.

IDAHO MARYLAND MINES CORPORATION

v.

The UNITED STATES.

HOMESTAKE MINING COMPANY

v.

The UNITED STATES.

(1) BALD MOUNTAIN MINING COMPANY, (3) Alabama-California Gold Mines Company, (5) Consolidated Chollar Gould & Savage Mining Company, (7) Ermont Mines, Inc.

v.

The UNITED STATES.

Nos. 49468, 49486, 49693, 50182, 50195, 50214.

United States Court of Claims.

Feb. 20, 1956.

Phillip Barnett, San Francisco, Cal., for plaintiff Central Eureka Mining Company. Ralph D. Pittman, Washington, D. C., and Rodney H. Robertson, San Francisco, Cal., were on the brief.

John Ward Cutler, Washington, D. C., for plaintiffs Oro Fino Consolidated Mines, Inc., Bald Mountain Mining Company, Consolidated Chollar Gould & Savage Mining Company and Ermont Mines, Inc.

O. R. McGuire, Jr., Washington, D. C., for plaintiff Alaska-Pacific Consolidated Mining Company. Hogan & Hartson, Washington, D. C., and V. A. Montgomery, Seattle, Wash., were on the brief.

George Herrington, San Francisco, Cal., for plaintiff Idaho Maryland Mines Corporation. Orrick, Dahlquist, Herrington & Sutcliffe, San Francisco, Cal., were on the briefs.

Edward W. Bourne, New York City, for plaintiff Homestake Mining Company. James D. Ewing, Eugene Z. Du

Bose, Edward E. Rigney, J. Kenneth Campbell and James W. Misslbeck, New York City, were on the briefs.

Kendall M. Barnes, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Thomas H. McGrail, Washington, D. C., was on the brief.

Before JONES, Chief Judge and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

The plaintiffs were, at the times herein mentioned, the owners and operators of gold mines. On October 8, 1942, the War Production Board issued Limitation Order L–208 requiring certain so-called non-essential mines to close down and cease all mining operations, or any other operations in and about the mines, except to the minimum amount necessary to maintain the mines safe and accessible. Violations of the order were punishable by fine and imprisonment. By its terms, the order suspended for the life of the order the right of plaintiffs to mine and sell gold.

It is plaintiffs' contention that this action by the Government amounted in law to a taking, for a public purpose, of their right to make profitable use of their mining properties for which just compensation is due them under the Fifth Amendment to the Constitution. In the alternative, the plaintiffs contend that by virtue of the jurisdiction conferred on this court by the special jurisdictional act of July 14, 1952, 66 Stat. 605, they are entitled to recover for the closing of their mines the amount of losses incurred as a result of Order L–208. It is plaintiffs' position that in the absence of the special jurisdictional act, this court would not have jurisdiction to render a judgment in favor of a gold mine owner for losses incurred unless they could establish a compensable taking, but that the act conferred on this court jurisdiction to render judgment for such losses where they resulted from the issuance of L–208.

Following denial by this court of the Government's motion to dismiss the petition in the case of the Idaho Maryland Mines Corp. v. United States, 1952, 104 F.Supp. 576, 122 Ct.Cl. 670, the instant cases were consolidated for trial before a commissioner of the court on the question of the Government's liability, the question of just compensation or the amount of damages being reserved for further proceedings.

By the time L–208 was issued by the War Production Board, on October 8, 1942, the President had delegated to that Board all allocation, priorities and requisitioning powers granted to him by Congress,[1] except the power to req-

1. The Act of June 28, 1940, 54 Stat. 676, as amended by the Act of May 31, 1941, 55 Stat. 236, as further amended by Title III of the Second War Powers Act of March 27, 1942, 56 Stat. 177, 50 U.S. C.A.Appendix, § 1151 et seq., gave to the President priorities and allocation powers and the authority to delegate such powers. Section 9 of the Selective Training and Service Act of September 16, 1940, 54 Stat. 885, 892, now 50 U.S. C.A.Appendix, § 468, gave the President the power to place mandatory orders for products or materials required for the national defense, and provided for the payment of just compensation for such products, or as rental for any facilities or plants used by the United States. The Act of October 10, 1940, 54 Stat. 1090 authorized the President to take over for use or operation any military or naval

equipment, etc., held for export purposes but whose exportation had been denied by law, and provided for payment of just compensation. The Act of October 16, 1941, 55 Stat. 742, authorized the President to requisition all other military or naval equipment not held for export. This act was amended in Title VI of the Act of March 27, 1942, supra, to eliminate the requirement that only equipment and machinery not in actual use by the owner could be requisitioned. Section 120 of the National Defense Act of 1916, 39 Stat. 213, 50 U.S.C.A. § 80, authorized the President to place mandatory orders for the production of materials required for defense and for the seizure of plants refusing to cooperate. All of these acts provided for the payment of just compensation for any interest taken. The President delegated all the above au-

uisition real property. In general, the purposes to be accomplished through the exercise of those powers were to increase production of raw materials and finished products needed for the national defense through the mobilization of the material resources and the industrial facilities of the nation. The Board's power to regulate the production and supply of materials, equipment and facilities necessary for the national defense was broad and was, in general, accomplished by the use of various orders, the most common of which were the "P" or priorities orders, the "M" or materials orders, and the "L" or limitation orders. "P" orders were usually addressed to buyers of materials, etc., and authorized them to attach to their purchase orders a symbol entitling them over other users to a certain preference in delivery. "M" or materials orders were allocation orders addressed to the manufacturers or distributors of materials. These orders were used to limit and define the use or the distribution of the particular material which was the subject of the order. "M" orders might also prohibit producers or distributors of certain materials or products from selling them to any buyer unless that buyer had a certain preference rating. "L" or limitation orders, were also related to the Board's allocation functions and were issued to curtail or prohibit the manufacture of end products which required the use of specified critical materials.

The mining industry, along with other industries, was subject to regulation of its acquisition and use of materials, supplies and equipment needed in the defense effort. A general repair order known as P–22 was issued on September 9, 1941, which authorized a variety of industries, including the mining industry, to use only the lowest preference rating, i. e., A–10, to acquire the materials needed for the repair of their mining property and equipment. On September 17, 1941, Preference Rating Order P–56 granted an A–8 preference rating to so-called recognized mining enterprises to acquire materials needed by them for operating supplies and for the maintenance of the mines' property and equipment. This order represented the first special treatment accorded to gold mines as distinguished from other types of mines, in that placer gold mines were expressly excluded from any benefits under the order. Lode gold mines were permitted the use of the A–8 rating because it was recognized that denying to them repair and maintenance supplies would cause depreciation of their installed equipment and structures, and because many lode mines produced metals other than gold which were useful to the defense effort.

As the critical materials supply situation became more acute, the Office of Production Management[2] found it necessary to take action that would insure a sufficient amount of new and repair parts for the mines producing critical

thorities to the War Production Board or its predecessors in a series of Executive Orders as follows: Executive Order 8572, October 21, 1940, as amended by Executive Order 8612, December 15, 1940 (the Priorities Board); Executive Order 8629, January 7, 1941 (Office of Production Management), U.S.Code Cong.Service 1941, p. 849; Executive Order 8875, August 28, 1941 (OPM and SPAB), U.S.Code Cong.Service 1941, p. 867; Executive Order 8891, September 4, 1941, U.S.Code Cong.Service 1941, p. 871; Executive Order 8942, November 19, 1941, U.S.Code Cong.Service 1941, p. 877; Executive Order 9024, January 16, 1942 (WPB), U.S.Code Cong.Service

1942, p. 49; Executive Order 9040, January 24, 1942, U.S.Code Cong.Service 1942, p. 51; Executive Order 9125, April 7, 1942, U.S.Code Cong.Service 1942, p. 355; Executive Order 9138, April 17, 1942, U.S.Code Cong.Service 1942, p. 363; by Executive Order 9139, April 18, 1942, U.S.Code Cong.Service 1942, p. 364, the President established the War Manpower Commission and transferred to it the labor supply functions of WPB's Labor Division.

2. At this time the Office of Production Management was still in existence. It was not succeeded by WPB until January 1942.

raw materials, and in order to do this it eventually became necessary to deny to mines whose production was predominantly gold the right to purchase any new machinery for use in that production, and to limit such gold mines to the lowest preference rating for the acquisition of maintenance, repair and operating supplies. Accordingly, on December 18, 1941, Preference Rating Order P-100 was issued granting the mines an A-10 or the lowest possible preference rating. On March 2, 1942, Preference Rating Order P-56 was amended to revoke the serial numbers of all gold mines whose total dollar production was more than 30 percent gold. Without a serial number, a gold mine could not acquire any materials needed for operating supplies, or supplies for the maintenance of their property and equipment. Over two hundred gold mines, including those of most of the plaintiffs herein, never again received serial numbers under Order P-56 and thus, by March 1942, a series of progressively more stringent regulations had virtually eliminated any opportunity for the gold mines to acquire critical materials and supplies needed for the national defense.

No agency of the Government was ever granted any real power to control civilian manpower during the war. However, the War Production Board found it necessary to take into consideration manpower problems obviously inherent in the overall problem of increasing the production of vital raw materials and finished products necessary for defense. Shortly after the establishment of WPB's predecessor agency, the Office of Production Management, an operating division known as the Labor Division was established in OPM to study and keep abreast of the labor requirements for national defense and to advise and collaborate with the other divisions of OPM on all matters affecting labor.[3] In the summer of 1942, the Labor Division of what was now WPB, became concerned with the seriously increasing shortage of hardrock or underground miners in the vital nonferrous metal mines, particularly in the copper mines. This concern was shared by the recently established War Manpower Commission and by the War Department which had become alarmed by the growing shortage in the output of copper. Upon investigation, these groups found that the exodus from the strategic metal mines was the result of the higher wages and better working conditions available to the miners in the aircraft and shipbuilding industries and on the armed services building construction projects frequently being carried on in the vicinity of the copper mines. It was also determined that a large number of experienced miners were being drafted into the armed services and Selective Service was adverse to granting deferments to such workers. Despite the urgings of mine employers and the government agencies involved to miners to stay on the job, the strategic metal miners continued to leave the mines for the more attractive job opportunities offered by other defense industries. Production was also hampered by the generally low morale of the miners, the short workweek in the mines, and the lack of any effective means of recruiting workers for work in the strategic metal mines.

During this same period the gold mines were losing experienced miners by virtue of the same circumstances, except that working conditions in many of the gold mines were good, many of the miners owned their own homes, and gold mining was often a family tradition from which they would not readily depart.

Based on 1940 and 1941 statistics furnished by the Bureau of Mines, the War Department, the War Manpower Commission and the War Production Board's Labor Division determined that if the gold mines could in some way be closed down, several thousand hardrock miners

3. OPM Regulation 5, March 18, 1941, 6 F.R. 1598, 32 CFR 2875-1941 Supp.

would immediately become available for work in the nonferrous metal mines, although no one was quite sure how they could be induced to go to work in such mines since no one had authority to require them to do so. A survey by WPB's Mining Division revealed that the labor figures arrived at by the Labor Division were unduly optimistic and that the probable number of hardrock miners employed in gold mines was much smaller than the estimate based on the 1940 and 1941 figures; that, after taking into consideration the number of hardrock miners who would be necessary to maintain the closed mines in safe condition, and the number who were elderly men and home owners and thus unlikely to leave their homes unless forced to do so, a relatively small number of experienced miners would be thrown on the labor market for any purpose. The conclusions of the Mining Division were reinforced by data supplied by representatives of the larger gold mines who came to Washington to confer with officials of WPB and the Army, and also by Congressional Representatives of the mining States. Everyone involved in the ensuing controversy was aware that there was no power in any arm of the Government to force gold miners to work in the nonferrous metal mines, and no way to deny to gold miners opportunities to work in the same war industries or on the same armed services' construction projects that had been luring the nonferrous metal miners away from their jobs in the mines. Selective Service could not bring itself to grant deferments to miners. The Army indicated that it might furlough some four thousand soldiers who had mining experience, and condition their furloughs on their staying on the jobs in the nonferrous metal mines. But the Army was reluctant to grant those furloughs while the gold mines were still operating. Army officials were furnished with facts and figures showing that few hardrock miners would be released by the closing of the gold mines and that there was no way

of compelling those miners to work in the copper mines and little likelihood that they would do so. Despite this, officials of the Army continued to bring great pressure to bear on the War Production Board to close down the gold mines, indicating that otherwise WPB would not be doing its part to increase production in the nonferrous metal mines. The Army's objection to the continued operation of gold mines appears to have been largely political rather than practical. Its reluctance to furlough trained soldiers was understandable, but the fact remains that it was the only governmental agency which had sufficient control over manpower to compel persons under its jurisdiction to work in the nonferrous metal mines and continue to do so.

Over the vigorous objection of informed persons in and out of the War Production Board, the Board on October 8, 1942, issued L-208 which ordered the complete shutdown within 60 days of all the country's gold mines which did not produce sufficient strategic metals to warrant their holding serial numbers.

Within a relatively short time it became apparent that the closing of the gold mines was doing little to relieve the shortage of hardrock miners in the strategic metal mines. In fact, the record indicates that no more than 100 gold miners went into other mines and remained there for a year or more. Despite numerous appeals and a desire on the part of WPB officials to modify the order to permit the gold mines to operate at least on a break-even basis, the order was continued in effect and unchanged until the summer of 1945.

The record establishes that no one having anything to do with the issuance of L-208 believed that it was devised or intended to be devised for the purpose of conserving critical materials, equipment or supplies, inasmuch as existing preference orders had solved that problem in connection with the gold mines. Although WPB had full power to requisition any large inventories of

supplies, materials, and equipment owned by the gold mines, or to authorize more essential users of such materials to place mandatory orders with the gold mines, no such power was ever exercised. In L–208 WPB did not even attempt to assure that those critical materials, equipment and facilities would be held for possible future requisition or order, but left the owners free to sell them to anyone they pleased, whether the prospective purchaser was engaged in essential defense work or not.

The record establishes that the purpose and intent of WPB in issuing L–208 was to deprive the gold mine owners and operators of the right to use their properties in the only way they could be beneficially used, i. e., to mine and sell gold for a profit, and that this was done in the unfounded hope that the underground workers thus deprived of their employment in the gold mines might seek employment in the nonferrous metal mines. The record fails to establish that the prohibition of gold mining was reasonably calculated to or in fact did increase the country's war efficiency.

The following contentions were made in the Homestake brief and were adopted in general by all the other plaintiffs. After discussing those contentions and disposing of them, we shall take up separately the applicability of the conclusions reached to each of the plaintiffs.

Plaintiffs contend that L–208, while in form a regulation restricting their acquisition and use of critical materials needed for defense, was in substance a requisition or taking, for the life of the order, of plaintiffs' right to make profitable use of their gold mining properties for which taking the Government is liable to pay just compensation under the Fifth Amendment to the Constitution. Plaintiffs also contend that if the court should decide that L–208 was actually a regulation in substance as well as in form, it was arbitrary in that it went far beyond what was required by the exigencies of the war situation existing at the time of its issuance, bore no reasonable relation to its ostensible purpose of conserving critical materials needed in the defense effort, and in fact and law amounted to a taking of valuable property rights of plaintiffs for which just compensation should be paid.

The Government contends that regardless of how much damage plaintiffs may have suffered by virtue of their compliance with the provisions of L–208, the order was a proper exercise of the statutory regulatory powers over critical materials by the War Production Board; that it was issued to prohibit plaintiffs' use of those materials in a manner detrimental to the public safety in wartime; that the Government made no use of plaintiffs' property nor did the order represent any positive invasion of any of plaintiffs' property rights, and that no direct benefits accrued to the Government from the imposition of the order except the negative benefit arising from the prohibitions placed on plaintiffs' use of their property. Defendant urges that under these circumstances, plaintiffs' losses are no more compensable than were the losses suffered by the St. Regis Paper Company from the imposition on it of War Production Board General Preference Order M–251, St. Regis Paper Co. v. United States, 76 F.Supp. 831, 110 Ct.Cl. 271, certiorari denied 335 U.S. 815, 69 S.Ct. 32, 93 L.Ed. 370, or the losses suffered by landlords who complied with wartime rent control regulations. Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892; Block v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865; Marcus Brown Holding Co. v. Feldman, 256 U.S. 170, 41 S.Ct. 465, 65 L.Ed. 877. Defendant also contends that if WPB acted arbitrarily and without good cause in issuing L–208, then the order was unauthorized and illegal and the Government is not liable to pay just compensation for losses occasioned by the unauthorized act of its agents, citing Hooe v. United States, 218 U.S. 322, 31 S.Ct. 85, 54 L.Ed. 1055 and United States v. North American Transportation & Trading Co., 253 U.S. 330, 40 S.Ct. 518,

64 L.Ed. 935. Defendant suggests that in this latter circumstance, plaintiffs should have refused to obey the order, Morrisdale Coal Co. v. United States, 259 U.S. 188, 42 S.Ct. 481, 66 L.Ed. 892, or they should have brought injunction proceedings against the officials of WPB to prevent enforcement of the order.

Our first problem is to determine the precise nature of the action taken by the War Production Board in its issuance of L–208, i. e., whether that action amounted to a regulation or a taking of plaintiffs' property rights. Next it must be determined whether WPB had the power to do what it in fact did, and finally whether the Government is liable for the injuries caused plaintiffs by the exercise of that power, even though the power was exercised arbitrarily.

■ The property which plaintiffs contend has been taken from them, and which defendant urges was merely limited in its usefulness to plaintiffs as a consequence of a valid regulation of scarce materials, was plaintiffs' right to make profitable use of their gold mining properties. As pointed out by Mr. Justice Roberts in United States v. General Motors Corporation, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311, while "property" as that term is used in the Fifth Amendment certainly means the physical thing with respect to which the citizen exercises rights recognized by law, it also means the group of rights inhering in the citizen's relation to the physical thing, as the rights to exclusively possess, use and dispose of the physical thing. In this sense, the right of a gold mine owner to extract gold from his mine and to sell it for a profit, is a property right protected by the Constitution. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322.

In order to determine whether that property right was "regulated" or "taken," or was merely injured as a consequence of a regulation or of a taking of some other property or property right of plaintiffs, we turn to the limitation order itself and to the facts and circumstances of record surrounding its issuance.

The order was issued on October 8, 1942, by the War Production Board which had succeeded to all the powers and functions of the old Office of Production Management and the Supply Priorities and Allocations Board. The preamble to L–208 reads as follows:

"The fulfillment of requirements for the defense of the United States has created a shortage in the supply of critical materials for defense, for private account and for export which are used in the maintenance and operation of gold mines; and the following order is deemed necessary and appropriate in the public interest and to promote the national defense."

The statutory authority cited at the conclusion of the order was section 2(a) of the Act of June 28, 1940, 54 Stat. 676, as amended,[4] which granted to the President the power to establish priorities and to allocate materials. The President's allocation powers were expressed in the following language, 56 Stat. 178, which it will be noted, closely resembles the above quoted language in the preamble of L–208:

" * * * Whenever the President is satisfied that the fulfillment of requirements for the defense of the United States will result in a shortage in the supply of any material or of any facilities for defense or for private account or for export, the President may allocate such material or facilities in such manner, upon such conditions and to such extent as he shall deem necessary or appropriate in the public interest and to promote the national defense."

4. Act of May 31, 1941, Pub.Law 89, 55 Stat. 236, Act of March 27, 1942, Pub. Law 507, 56 Stat. 177, 50 U.S.C.A.Appendix, § 1152(a).

As further authority for its issuance, the order cited Executive Order 9024 (January 16, 1942) abolishing SPAB and establishing the War Production Board, Executive Order 9040 (January 24, 1942), abolishing the Office of Production Management and transferring to WPB all of its duties and powers along with those of the old SPAB, and providing that WPB should perform the functions and exercise the authority vested in the President by section 120 of the National Defense Act of 1916, 39 Stat. 213. Section 120 of the last mentioned act provided that the President in time of war might, through the head of any Government department or agency, place mandatory orders with individuals, firms, associations, etc., for products produced by them; that if there was a refusal to make or sell at a reasonable cost any product required in response to such mandatory orders, the President, through the head of any department, might take immediate possession of the plant. The section provided for the payment of compensation for any product or material acquired by mandatory orders, or as rental for the use of the manufacturing plant. Executive Order 9125, April 7, 1942, also cited in L–208, contained the President's delegation of his allocation and priority authority to WPB pursuant to Title III of the Second War Powers Act of 1942, 56 Stat. 176, 50 U.S.C.A.Appendix, § 1152.

Order L–208 provided that for the purposes of the order all gold placer or lode mines located in the United States or its territorities or possessions which did not hold serial numbers under Preference Rating Order P–56 were deemed "nonessential mines".[5] The order then required such nonessential gold mines to do the following: (1) to close down as soon as possible after the issuance of the order; (2) to cease acquiring, consuming or using any material, facility or equipment for the purpose of

breaking any *new* ore or for the purpose of carrying on any development work; (3) on or after 60 days from the issuance of the order, to cease acquiring, consuming or using any material, facility or equipment to remove *any* ore or waste from the mine, above or below ground, or to conduct any other operation in or about the mine except to the minimum amount necessary to maintain the buildings, machinery and equipment in repair, and the mine's access and development workings safe and accessible; (4) to refrain from using any preference rating to acquire any material or equipment for consumption or use in the operation, maintenance or repair of the mines covered by the order, except with the permission of the Director General for Operations. The order provided that the Director General for Operations, WPB, might assign preference ratings only for obtaining the minimum amount of material needed to maintain the nonessential gold mines in safe condition during the closedown. Violations of the provisions of the order were made a crime punishable by fine or imprisonment. The order provided that persons affected by the order might appeal to the Board by letter and that the Director General for Operations might thereupon take such action as he might deem appropriate.

The preamble to the order, the authority cited at the end thereof, and the prohibition placed upon the acquisition of critical materials, indicate that the order was merely intended to allocate *away from* the so-called nonessential gold mines materials, equipment and facilities which were in short supply and needed for defense. A study of the balance of the order, particularly in the light of certain facts of record, persuades us that the order was not intended to be an allocation order. Insofar as the order prohibited the acquisition of materials, equipment and facilities, certain existing orders, P–56 and P–100,

5. This provision had the effect of including in the operation of the order all mines whose gold production in dollar value exceeded 30 percent of its total production.

already prevented the acquisition by the gold mines of any such materials except, in the case of P–100, where gold mines did have the lowest priority rating in existence for repair parts, and that could have been revoked. The record establishes that the gold mines, particularly the Homestake mine, had on hand in October 1942 large amounts of materials, equipment and facilities needed in the mining of gold and that Homestake, and some of the others whose circumstances we shall discuss separately, could have continued operations with such inventories for a considerable period after October 8, 1942. L–208 did not in fact "allocate" any of such materials, equipment or facilities away from the mines but, on the contrary, left the mine owners and operators free to dispose of them in any manner they saw fit, by delivering or selling them to non-essential users or by keeping them in the mines. What the order did do, and do directly, was to prohibit the continued operation of the gold mines.

A comparison of L–208 with General Preference Order M–251 which was involved in the St. Regis case, supra, may aid in evaluating the Government's contention that the two orders were alike in their purpose, operation and effect, and that the loss of the gold mine owners' right to make profitable use of their mining properties was merely a consequential injury resulting from a valid allocation of critical materials away from the mines in the same way that the injury to the paper company's right to do business was the consequence of a valid allocation of pulpwood away from the company.

The preamble to the St. Regis Order, M–251, was in all material respects identical with the preamble of the gold order, L–208.[6] The order was issued on October 19, 1942, ten days after the issuance of the gold order, and the authority cited for its issuance was identical with that cited in the gold order.

Order M–251 provided that in areas declared by WPB's Director General for Operations to be shortage areas, the Director General could allocate the available supply of pulpwood held or accumulated in that area away from and to specific persons; that he could direct the holders of pulpwood in the area to maintain their accumulations of pulpwood *available for disposition* by the Director General who might direct the delivery of specific quantities of such accumulated pulpwood to specific persons. The Director General was authorized to direct that no one in the area might acquire, consume, process or deliver any pulpwood of the types defined, and which were held or accumulated in the area, *except as the Director General might order*. The Director General was also authorized to require the manufacture of particular types of woodpulp or other wood products by manufacturers. On October 23, 1942, this order was applied specifically to the St. Regis Paper Company and that company was forbidden to acquire, consume, process or deliver any pulpwood, except on authorization or by direction of the Director General for Operations of WPB. Immediately upon issuance of the order to St. Regis, that company was directed by the Director General to deliver during the month of November its entire inventory and supply of pulpwood to specified persons "at regularly established prices and terms", subject to OPA regulations. St. Regis was permitted to continue processing and man-

6. General Preference Order M–251 contained the following preamble:
"The fulfillment of requirements for the defense of the United States has created in certain areas and is expected to create in other areas a shortage in supply for defense, for export and for private account, of wood for pulp and lumber, and has created a shortage in the supply for defense, for export and for private account of various materials and facilities required for the production of pulpwood; and the following order is deemed necessary and appropriate in the public interest and to promote the national defense."

ufacturing its customary products from pulpwood during the balance of October. Although the order did not direct plaintiff to close its factory and plaintiff was left free to make any use of its factory it could, its inability to secure pulpwood resulted in the closing of the mill, plaintiff having decided that it was not feasible to convert its facilities to some other type of manufacturing that would not require the use of pulpwood.

In its suit in this court, the St. Regis Paper Company contended that M–251 amounted to a temporary taking of its paper factory and of its right to do business. Although it was not made an issue in the case, M–251 probably did amount to a taking of plaintiff's inventory of pulpwood, cf. Edward P. Stahel & Co., Inc., v. United States, 78 F.Supp. 800, 111 Ct.Cl. 682, certiorari denied 336 U.S. 951, 69 S.Ct. 878, 93 L.Ed. 1106, but plaintiff did not sue for the taking of its pulpwood, probably because shortly after the order was issued plaintiff received what it considered to be just compensation on the mandatory sales to the Government's designees pursuant to M–251. The court held that M–251 did not require the closing of plaintiff's plant nor did it interfere with plaintiff's use of the plant; that, on the contrary, the order represented a valid exercise of WPB's admitted power to allocate a scarce material such as pulpwood, and that any injury to plaintiff's profitable use of its plant, or any loss in value of its plant, were merely consequential and therefore did not amount to a taking and were not compensable. The terms of the order itself certainly bore out the court's conclusion since the order merely represented an attempt by the Government to secure all the available supply of pulpwood in the area by freezing the supplies on hand with the owners in the area and immediately placing mandatory orders directing delivery to specified users elsewhere, and by prohibiting the users in the area in question from acquiring any more pulpwood.

Like M–251, the gold order prohibited the acquisition, consumption or use of certain personal property used in the mining of gold. L–208 did not, however, require the gold mine owners to hold for the use or disposition of the Government their inventories and supplies of the personal property covered by the order but left the owners free to use that personal property in any way they wished except in the mining of gold. The plaintiffs might have sold their inventories of machinery, supplies and equipment to any user whether or not that user was conducting a business which was essential to the defense effort. The record establishes that the Government did not intend to, nor did it ever, requisition any of this personal property or direct the mine owners to sell it to anyone else. From the language of the order itself and from the circumstances surrounding its promulgation, it is apparent that its only purpose was to deprive the gold mine owners and operators of their right to make use of their mining properties.

Since the subject matter of L–208 was the gold mine owners' right to make use of their gold mines and was not the materials, equipment and facilities they had on hand and in which the Government apparently had little interest, the next question is whether L–208 amounted to a "regulation" of that property right or to a "taking."

"Regulation" implies a degree of control according to certain prescribed rules, usually in the form of restrictions imposed on a person's otherwise free use of the subject matter of the regulation. Where the restrictions imposed are temporary and narrow, and where the persons on whose property the restrictions are imposed are assured an opportunity to receive "reasonable" compensation as determined by an impartial arbiter, the courts have held that enforcement of such regulations has not deprived the owner of the regulated property of due process, nor has it resulted in the "taking" of a property right in the constitutional sense. Typi-

cal of this type of regulation are the rent control regulations referred to above, regulations issued under the renegotiation statute, Lichter v. United States, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694, limiting the right to make excessive profits on war contracts, and restrictions imposed in mortgage moratorium legislation. Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413. On the other hand, where the restrictions imposed by the so-called regulations are so broad that the owner of the property regulated is deprived of most or all of his interest in the property, for all practical purposes there has been a taking of that property. Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593.[7]

The case of Edward P. Stahel & Co. v. United States, referred to earlier herein, has much in common with the issues raised in the instant controversy as well as with those involved in the earlier case of St. Regis Paper Co. v. United States, supra. In the Stahel case, as in the others, plaintiffs alleged that an order of the Office of Production Management (predecessor agency to the War Production Board) though in form a regulation, operated in such a manner as to take valuable property rights of plaintiffs without payment of just compensation. The order in question was General Preference Order M–22 issued on October 16, 1941. M–22 prohibited the owners of raw silk, including the plaintiffs, from selling or delivering their silk to any user but the Government or persons designated by the Government, and further provided that any orders placed with such owners by the Government or its designees had to be accepted and filled. The order did not prohibit the acquisition of raw silk by plaintiffs. Some two months after the issuance of M–22, the Government and its designees began placing mandatory orders with plaintiffs for the silk which was paid for, upon delivery, at the OPA price. Plaintiffs sued for additional compensation for the silk, alleging that the "taking" had occurred on the issuance of General Preference Order M–22 on October 16, 1941, and that, accordingly, they were entitled to recover an additional amount to compensate them for delay in payment, plus amounts expended for storage and handling of the silk after October 16, 1941, until the silk was finally delivered to and paid for by the Government or its designees. The Government contended that M–22 was merely a regulation which placed certain limitations or restrictions upon plaintiffs' right to sell their silk and that these limitations were imposed in the proper exercise of the sovereign's lawful power to allocate scarce materials in wartime *away from* nonessential to essential users, and that while the restrictions imposed in the interest of the defense effort may have decreased the value of the silk to the plaintiffs, the silk was not taken on October 16, 1941, citing Omnia Commercial Company, Inc., v. United States, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773; Bowles v. Willing-

---

7. The Home Building & Loan Association case, supra, involved the constitutionality of a Minnesota statute which, in time of economic depression sought to relieve the plight of needy mortgagors by providing for a possible extension of the redemption period of their mortgaged property. Citing the many safeguards contained in the statute to protect the rights of the mortgagee and the fact that the mortgagee would ultimately receive all that he was entitled to under the mortgage, the Court upheld the statute as a *limited* and *temporary* restriction on the mortgagee's right to enforce his contract, such restriction being justified by the great public calamity, i. e., the depression. This case was relied on by the mortgagor, Radford, in Louisville Joint Stock Land Bank v. Radford, supra, to uphold the constitutionality of the Frazier-Lemke Act of 1934, 11 U.S.C.A. § 203, which also sought to relieve the plight of needy mortgagors during the depression. The Supreme Court held that the restrictions imposed by the federal act were neither limited nor temporary and that they amounted to a taking of valuable property rights of the mortgagees without any compensation whatsoever.

ham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892.[8] The Government pointed out that on October 16, 1941, when the order was issued, the Government did not take any positive action regarding plaintiffs' property which, on ·the contrary, was left in the possession and control of the plaintiffs subject only to the negative power of the Government evidenced by the restriction that it might not be sold or delivered to anyone but the Government or its designees. The court held that the restrictions imposed by M–22 on plaintiffs' use of its silk were so broad that, for all practical purposes, plaintiffs were deprived of their silk; that although the silk did remain in the actual possession of the plaintiffs after October 16, 1941, it was held not for their own use but for the use of the Government whether the Government ever exercised its right under the order to demand delivery of the silk or not.[9] The court noted that the Government had the statutory power to requisition plaintiffs' silk and pay just compensation therefor on October 16, 1941, and held that the Government's choice of a general preference regulation as a means of acquiring the use of plaintiffs' property in preference to a formal requisition did not deprive the operation of M–22 of its character of a taking, or lessen plaintiffs' constitutional right to just compensation. Plaintiffs' recovery included an additional amount to compensate them for delay in payment, plus amounts expended by them in handling and storing the silk after October 17, 1941.

It seems to us that the restrictions placed by L–208 on the right of gold mine owners to mine and sell gold were neither conditional nor limited and were as complete as were the restrictions placed on plaintiffs' silk in the Stahel case. In neither the Stahel case nor the instant case did the Government, through the orders issued, attempt to vest in itself title to the subject matter of the orders, or to assert any proprietary rights in the· subject matter. In both cases the orders merely sought to impose certain negative restrictions on the otherwise free use of their property by the owners. If plaintiffs' silk was taken by M–22 because that order served to deprive plaintiffs of all beneficial use of their silk, regardless of the fact that physical invasion of the property right was merely threatened in the order and might never have taken place, it would seem to follow that L–208 was equally a taking of the right of the gold miners to make profitable use of their mining properties by mining and selling gold.[10] It also appears that the loss of the gold mine owners of their right to

8. In the Omnia case the Government had requisitioned the entire output of steel by the Allegheny Steel Company and had directed the company not to comply in that year with any contract calling for steel. The Omnia Commercial Company had a contract with the Allegheny company entitling Omnia to Allegheny's steel at a price well under the market. Omnia sued the United States alleging that the Government had "taken" its right to have its contract with Allegheny performed. The court held that the contract had not been taken but only its performance frustrated and that Omnia's loss of the expected profit was a consequential loss resulting from lawful governmental action of requisitioning Allegheny's steel. In the Bowles v. Willingham case the Supreme Court held that rent control imposed only temporary and narrow restrictions on an owner's use of his property.

9. In its motion for a new trial which was denied, the Government pointed out that under the court's decision a holder of silk on October 16, 1941, who had never received a mandatory order for any of its silk, would still be entitled to the same compensation as the holder who sold all of his silk on mandatory orders.

10. It is not contended that their right to mine and sell gold was acquired by defendant in the sense that the Government actually took possession of the mines and carried on the business for its own benefit. It is contended, however, that the Government deprived plaintiffs of their right to make profitable use of their mining properties for the period during which the order was in effect and that this deprivation amounted to a taking. That Government action short of acquisition of title or short of physical occupancy may constitute a "taking" in

mine gold was the direct result of L–208 and was not a consequential loss in the sense that it was the result of the exercise of defendant's power to allocate scarce materials, or to take such materials, as was plaintiffs' loss in the St. Regis case, supra, because, as we have seen, L–208 neither allocated nor took plaintiffs' inventory and supply of critical materials, equipment and facilities.

To allocate means to distribute or to assign. Allocation is the act of distributing or of putting one thing to another. Insofar as L–208 prohibited the *acquisition* by gold mine owners of materials, equipment and machinery, the order was allocating the available supply of those items *away from* the gold mines so that there might be more to distribute or allocate to mining enterprises considered to be more essential to the war effort. Insofar as L–208 prohibited the mine owners from using any of the materials, supplies, equipment, machinery and facilities owned by them and on hand, that prohibition allocated nothing, i. e., it distributed nothing because the order contained nothing which required the gold mine owners to sell those items to the more essential users. Furthermore, because the order merely deprived the owners of the machinery, materials, supplies, etc., on hand, of the use thereof for one single purpose, i. e., for the continued mining of gold and left the owners free to otherwise dispose of those items as they pleased, that prohibition did not amount to a "taking" of the materials, equipment, machinery, etc., owned by the gold mine owners and operators. The fact that occasional voluntary sales of idle gold mining machinery were made to some more essential mines does not give to that part of L–208 prohibiting the owners from

using those items to mine gold the character of an allocation order; it merely emphasizes the fact that those items were not "taken." But the petitioners herein are not suing for the taking of their machinery, facilities and supplies on hand.

We turn next to a consideration of whether L–208 was in fact a limitation order. Limitation orders were used to supplement priority orders which were not always effective to keep nonessential manufacturers of nonessential products from acquiring critical materials. Such nonessential manufacturers, even with the lowest priority rating, might be able to pick up from time to time a significant amount of critical materials which at a later time might be needed by essential manufacturers. To remedy this situation, limitation orders were directed to the manufacturers of *specified end products* which were considered nonessential in wartime, such as office machinery, furniture, bicycles, stoves and passenger automobiles, and they prohibited the manufacture of such end products into the manufacture of which went critical materials.

No critical materials went into the end product of a gold mine, i. e., refined gold. The gold mining industry used critical materials only for the maintenance, repair and operation of the mines. If it had been the sole purpose of WPB to prevent gold mines from *acquiring* critical materials to a greater extent than they were already prevented by P–56, under which they could acquire nothing because their serial numbers had been revoked, and under P–100 under which they could acquire only limited amounts with their lowest (A–10) priority rating, that part of L–208 which absolutely prevented the acquisition of

the constitutional sense has been upheld by the Supreme Court. United States v. General Motors Corp., supra; United States v. Welch, 217 U.S. 333, 30 S.Ct. 527, 54 L.Ed. 787; Richards v. Washington Terminal Co., 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088. As Justice Roberts pointed out in the General Motors decision [323 U.S. 373, 65 S.Ct. 359],

it is the "deprivation of the former owner rather than the accretion of a right or interest to the sovereign" which constitutes the taking, and if the effects of the Government's actions are so complete as to deprive the owner of all or most of his interest in his property, that property has been "taken."

those materials to operate the mines, effectively did that.

It has been suggested by defendant that a further purpose of a limitation order was to prevent the consumption of critical materials already on hand and owned by a nonessential industry in order to "conserve" such critical materials. The question immediately arises in connection with L–208: In what significant way did L–208 *conserve* such critical materials, i. e., the equipment and machinery and supplies of the gold mines? Presumably something is "conserved" for the purpose of putting it to some more important use, otherwise what is the object of "conservation"? A material may be in short supply but if it is not needed by anyone, it seems hardly a proper object of conservation, and if it is kept idle or saved up, it would appear to be merely hoarded rather than conserved. Also, if something is scarce and is urgently needed by others, it cannot be said to be conserved unless the so-called conservation measure makes some effective provision for getting that scarce and needed material into the hands of essential users. The provision may appear in the same measure or in a supplemental measure. This was not done in L–208 and it was this omission which robs the order of the character of a *bona fide* limitation order.

L–208 was labeled a "Limitation Order", and up to a point it followed the pattern of true limitation orders. But a limitation order has a specific purpose: it is issued to conserve critical materials so that those materials may be used by essential war industries. It is not issued to insure that those critical materials will deteriorate through disuse or be preserved for future use by the nonessential owners thereof. L–208 made specific provision for the gold mine operators to preserve their own critical machinery and equipment so that they, i. e., the nonessential owners, would have that equipment and machinery in good condition for use in gold mining when the limitation order was finally lifted.

Paragraph (b) (3) of L–208 provided that no gold mine operator might ac-

quire, consume or use any critical material, facility or equipment *except to the minimum amount necessary to maintain the gold mine's buildings, machinery and equipment in repair and its access and development workings safe and accessible.* Paragraph (c) of the order authorized the Director General for Operations of WPB to assign such preference ratings as might be required to gold mine operators to enable them to obtain the minimum amount of critical materials necessary to maintain their nonessential mines on the basis set forth in subparagraph (b) (3), i. e., to keep their machinery and equipment in repair, *inter alia.*

The above makes it quite clear that the "conservation" brought about by L–208 with respect to the mining machinery and equipment owned by the mine operators was not the usual conservation purpose of a limitation order of WPB, i. e., conservation so that the equipment, machinery and materials owned by a manufacturer of nonessential products might be converted to the manufacture of essential end products either by the owner or by some manufacturer of an essential end product. Any actual conservation intended and brought about by that part of L–208 which prohibited the use of the gold mine owners' equipment and machinery for the mining of gold was for the purpose of conserving that equipment and machinery for future use by the nonessential gold mines in the production of nonessential gold.

In summary, it appears to us that only to the extent that L–208 prohibited the *acquisition of new materials and equipment* was that order either a limitation or an allocation order. The balance of the order, having to do with the prohibition of the consumption and use of materials, equipment and machinery owned by the mines and on hand, in the operation of the gold mines, was not intended to and could not, under the very terms of the order itself, accomplish any of the purposes of allocation or limitation orders. Since that prohibition on use of materials and equip-

ment on hand was neither a limitation nor an allocation order, the destruction of the right to mine and sell gold ·was not consequential to a limitation or allocation order.

■ L–208 was aimed, in all its provisions, directly at the beneficial use of the mining properties of the gold mine owners, and the only intention reasonably inferrible from the language of the order itself and the circumstances surrounding its issuance was an intent to temporarily deprive them of that property right. By the issuance of Order L–208 the defendant prohibited the carrying on of otherwise lawful mining operations and thereby placed a definite servitude on plaintiffs' profitable use of their mines which resulted in a temporary taking of that property right. See Peabody v. United States, 231 U.S. 530, 34 S.Ct. 159, 58 L.Ed. 351; Matthews v. United States, 87 Ct.Cl. 662, 720.

We come next to the question whether the War Production Board had the necessary authority to issue an order which would have the effect of depriving plaintiffs of their right to make profitable use of their mining properties. The Government contends that if, as argued by plaintiffs, WPB acted "arbitrarily" in issuing L–208, it acted without authority and the Government is not liable to pay just compensation for property destroyed by the unauthorized act of its agents.

■ While it is true, in general, as urged by defendant, that the Government is not liable for damages occasioned by the unauthorized acts of its agents, the problem of determining whether or not a particular act was "authorized" is not always a simple one.

If the statute under which the Government agent is acting specifically forbids the particular act complained of, that action is clearly unauthorized and ·the Government will not be liable for damages resulting from that action. Hooe v. United States,[11] supra.

■ If an agent of the Government acts without any statutory authority, that action is unauthorized and the Government will not be liable for damages resulting from that action. In such a case the injured person's remedy would be by injunction against the individual government official acting without authority. Youngstown Sheet & Tube Co. v. Sawyer, 343. U.S. 579, 72 S.Ct. 863, 866, 96 L.Ed. 1153. In that case the President issued an order directing the Secretary of Commerce to take and operate most of the Nation's steel mills. Although there were in existence at that time two statutes authorizing the President to take both personal and real property under certain conditions, the Supreme Court held, and the Government admitted, that those conditions were not met. Furthermore the Court noted that the seizure technique to solve labor disputes in order to prevent work stoppages was not only unauthorized by any congressional enactment but that Congress had refused to adopt that method of settling labor disputes when it was considering amendments to the Taft-Hartley Act in 1947, 29 U.S.C.A. § 141 ·et seq. The Court further held that not only was there no statutory authority for the seizure or taking of the steel mills, but also there

11. In the Hooe case a federal statute provided that in renting space for Government use, Government officials might not obligate the Government for the future payment of money in an amount in excess of the appropriation. A Government official rented from plaintiff a part of his building at a rental in the full statutory amount, but occupied additional space in the building for which plaintiff was not·paid. ·Plaintiff sued for the additional rent either on the ground of an implied contract or as just compensation for private property taken for public use. It was held that the Government was not liable on either theory since the officer acted without lawful authority when he did anything which tended to commit the Government to pay more rent than the statutory maximum and that in so doing he was not representing the United States.

was no constitutional authority for such a taking in that the President had no such inherent power. In the instant case Congress had by legislative enactment given the President authority to take for title or for use both real or personal property or interests therein, and those statutes did not impose " 'cumbersome, involved, and time-consuming' " conditions referred to by the Supreme Court in connection with the statutes referred to in the Youngstown case. On the contrary, the conditions imposed by the wartime statutes were simple, and involved (1) that the taking be *deemed* by the President or his designee to be necessary for the prosecution of the war and (2) that just compensation be paid the owner of the property interest taken. It is true that the wartime statutes under which the President and WPB operated did not specifically authorize the closing of any business as a means of taking over that business. But the closing amounted to a taking and the President and WPB were authorized to take private property when, *in their opinion,* such taking would be in the interests of national defense. We have here then, merely the use by WPB of an unorthodox and perhaps *unauthorized means* of accomplishing an *authorized end* or result, i. e., a taking. And if a taking is authorized by Congress, it is compensable under the Constitution despite the means used to accomplish it, as we shall discuss more fully hereinafter.

■ Where the agent's actions are not prohibited by statute and where they are within the general scope of his authority, although under general law they may be tortious, the modern trend is to hold such actions to be the acts of the sovereign. This subject was discussed at some length in Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628, in which the Court held that the District Court did not have jurisdiction to grant an injunction preventing officials of the War Assets Administration from selling coal to anyone other than the petitioner on the ground that the suit was actually one for specific relief against the Government which had not consented to be so sued. The petition in that case alleged that the War Assets Administration had sold certain surplus coal to the petitioner; that the Administrator for that agency had then refused to deliver the coal to petitioner and had entered into a new contract to sell the coal to others; that the petitioner's contract with the Government was an immediate contract of sale under which title to the coal had passed to the petitioner; that, accordingly, retention of the coal by the Administrator, after demand, was a conversion of petitioner's property and the Administrator's actions illegal so that the relief prayed for was not against the Government but against the Administrator individually to enjoin his threatened tortious action. The Supreme Court held that the Administrator had statutory authority to make decisions concerning the meaning and effect of the contracts he entered into on behalf of the Government, and that such authority included the authority to make incorrect as well as correct decisions, whether of law or of fact; that any action taken pursuant to an incorrect decision was not, *ipso facto*, an unauthorized or illegal act, but might well be the act of the sovereign even where the act involved the wrongful withholding of property belonging to the petitioner, i. e., a conversion. The Supreme Court then held that the action of an officer of the sovereign, "be it holding, taking or otherwise legally affecting the plaintiff's property," could only be regarded so illegal as to permit suit for specific relief against the officer as an individual where that action was clearly outside the officer's statutory powers or where, though within those powers, the powers themselves were constitutionally void. The Supreme Court stated at page 695 of 337 U.S., at page 1464 of 69 S.Ct.:

"There is, therefore, nothing in the law of agency which lends support to the contention that an officer's tortious action is *ipso facto* beyond his delegated powers. Nor, do we think, is there anything in the

doctrine of sovereign immunity which requires us to adopt such a view as regards Government agencies."

The Supreme Court concluded that since the Administrator's tortious actions were taken pursuant to erroneous decisions (of law) which he was authorized to make, he was acting for and as the representative of the Government and not in his individual capacity. The injunction was denied because it would have required specific relief against the Government itself. The Supreme Court suggested that the petitioner's remedy was in the Court of Claims for damages for breach of contract or for just compensation for the taking of the petitioner's coal.

Where a Government agent exercises a statutory power in a manner not provided for in the statute, the courts have held that his action was not "unauthorized" if the result of the action was one contemplated by the statute. In Hurley v. Kincaid, 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637, petitioner had obtained an injunction in the District Court restraining certain Government officials from proceeding further with the construction of a flood control project then being carried out under the Federal Flood Control Act, 33 U.S.C.A. § 702a et seq. It was clear that the continued construction would necessarily destroy portions of plaintiff's property. The lower court granted the injunction on the ground that the Government officials were acting "illegally" and therefore in their individual capacity in threatening to proceed with the project without first acquiring by formal eminent domain proceedings, as they were specifically required to do by the Flood Control Act, the necessary flowage rights over petitioner's land. The Supreme Court reversed the action of the lower court granting the injunction, on the ground that the acts complained of were the acts of the sovereign and not the individual acts of the officials; that the Flood Control Act authorized the taking of petitioner's land or of an easement therein; that the only "illegality" involved was the failure of the Government officials to compensate petitioner for the land taken and that such a circumstance afforded no basis for an injunction where, as in that case, compensation might be procured by the petitioner in an action at law in the Court of Claims. The Supreme Court held that the Fifth Amendment assured plaintiff of just compensation but that, 285 U.S. at page 104, 52 S.Ct. at page 269, footnote 3, it did not entitle him to be paid the compensation in advance of the taking:

"Even where the remedy at law is less clear and adequate, where large public interests are concerned, and the issuance of an injunction may seriously embarrass the accomplishment of important governmental ends, a court of equity acts with caution, and only upon clear showing that its intervention is necessary in order to prevent an irreparable injury."

Although the Supreme Court did not characterize as "arbitrary" the action of the Government officials in refusing to institute condemnation proceedings as provided for in the Flood Control Act, it would seem that such action was arbitrary in the same manner that a willful breach of a Government contract by a contracting officer is arbitrary. In neither case, however, are such arbitrary actions "unauthorized" in that they were forbidden by statute or were clearly outside the scope of the powers delegated by statute.

A regulation may be so arbitrary in its application to the particular subject matter and under the circumstances that it actually results in the regulatory body exercising powers not conferred on it by statute. This was the case in Berwind-White Coal-Mining Co. v. United States, D.C., 9 F.2d 429. Plaintiffs therein were owners of coal mines and private coal cars. They sought to enjoin the enforcement of an order of the Interstate Commerce Commission relating to the distribution among bituminous coal mines of coal cars during times of car shortages. Enforcement of the order would

have prevented the plaintiffs from using their private coal cars. The court observed that the rights of private car use and ownership are recognized by Congress, and that Congress had not delegated to the Commission any power over private car owners or over the soft coal industry. The court held that in issuing the order in question the Commission, through what purported to be an exercise of its regulatory power over carriers, actually abolished the use of private coal cars to a substantial extent and thus deprived the private car owners of the full enjoyment of their rights to operate their mines and supply themselves with coal from other mines. The order of the Commission was held to be unjust and unreasonable and to amount to an unlawfully arbitrary exercise of power which had the effect of regulating that which the Commission had no power to regulate.

■ It would seem to follow from the above, that the "arbitrary" action of a Government official is not necessarily "unauthorized" and "illegal" if the action represents an exercise of powers delegated to the official by the sovereign.

■ In the instant case the record establishes that as an order allocating critical materials away from a nonessential user, L–208 was arbitrary and unreasonable. The amount of such materials which were thereby prevented from being delivered to the gold mines was not signficantly greater than was already prohibited by existing priority orders, and a simple revocation of those orders insofar as they applied to the gold mines, would have cut off all such deliveries. L–208 did not require the owners of the critical materials to hold the materials they had on hand for the use of the Government or some essential user to be designated by the Government, nor did it require that the owners deliver the materials to such essential users, but rather left them free to dispose of the critical materials in any way or to anyone they pleased. The only use which the gold mine owners were forbidden to make of the critical materials, equipment and supplies which they owned and had on hand, was in the operation of their gold mining properties. Despite its preamble and the authority cited for its issuance, the language of the order itself and the circumstances surrounding its issuance indicate that neither its purpose nor its effect was to conserve or allocate critical materials, equipment and facilities needed for defense, but was rather to deprive the gold mine owners of their right to make profitable use of their gold mines. Viewed as a taking of that property right, the order was equally arbitrary since the record discloses that those officials responsible for its promulgation either knew or should have known that the only reason for the order, i. e., relieving the manpower shortage in the nonferrous metal mines, would not be accomplished thereby. However, we think that the only "illegality" involved in WPB's arbitrary action was its failure to pay just compensation for the property right of which plaintiffs were deprived, because we believe that WPB had the necessary statutory authority to take this property. By October 1942, Congress had conferred upon the President authority to requisition, place mandatory orders for, or take for title or for use, any real or personal property or interests therein which he deemed necessary to successfully prosecute the war. These statutes left the determination of war necessity to the absolute discretion of the President, but they required the payment of just compensation for any property taken or used. Congress also authorized the President to take possession of factories or other business establishments and to operate them if it was deemed by him to be in the interests of the national defense to do so. All these powers were delegated to the War Production Board except the President's power to condemn real property. Although none of the statutes contained specific language authorizing the requisition of a business in order to keep that business from operating at all, if the Government felt that the idleness of a business would be of benefit to the defense effort but did not believe the

business sufficiently evil or dangerous in wartime to justify its closing,[12] we suppose its powers of requisitioning were broad enough to permit such action, subject, however, to the obligation to pay just compensation to the owner. Neither party has suggested that the Government lacked such power.

Defendant also urges that if, as plaintiffs contend, the only purpose of the order was to divert manpower from the gold mines to the nonferrous metal mines, then the action taken by WPB in issuing the order was unauthorized because the War Production Board had no authority to issue orders affecting manpower.

From our study of the statutes, executive orders and regulations relating to WPB, we think that WPB was authorized to take into consideration the manpower implications of any order it might issue. The relationships between manpower and the consumption of scarce materials, and between manpower and increased production of vital end products, are of too obvious significance in the whole war production situation to suppose that they were not the legitimate concern of the War Production Board. The establishment of the Labor Division early in the life of the Office of Production Management and the presence on the War Production Board itself and on the War Manpower Commission of the Director of the Labor Division, are ample evidence of this concern. While Congress never enacted legislation which gave the Government the power to order a civilian worker to leave one job and go to another, or to order an employer to discharge an employee in order that the employee might be hired by someone else, it was no objection to an order of the Government, otherwise valid, that one of the results of its enforcement would be a better utilization of available manpower in the interests of the national defense. That the main objective of the gold limitation

order may have been to bring about a shift in the employment of underground gold miners from the gold mines to the nonferrous metal mines is, we think, immaterial on the issue of the order's validity, since the order did not in any of its provisions attempt to exercise authority with respect to manpower and provided no possible basis for any attempted enforcement of the latent manpower purpose.

The only circumstance under which the Government may escape the obligation to pay for property which is destroyed or taken by the authorized action of its agents, is where, in time of war, that property is inherently dangerous, or is being used in such a manner as to clearly endanger the public safety. Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194; United States v. Caltex, 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157. Gold mines which did not possess a serial number under WPB Order P–56 because they did not produce significant amounts of critical metals in addition to gold, were determined by WPB to be "nonessential," but we know of no precedent which would justify our holding that a nonessential industry or business was, *ipso facto*, one endangering the public safety in time of war. That such an industry could be regulated, and strictly regulated in wartime, is unquestioned, and resulting losses are not compensable if the action taken is truly regulatory in nature. But the power to regulate a nonessential but nondangerous industry in wartime is not the power to destroy, and limitation is not the equivalent of confiscation. Stone v. Farmers' Loan and Trust Co., 116 U.S. 307, 331, 6 S.Ct. 334, 388, 29 L.Ed. 636. As the Supreme Court said in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322, "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."

12. Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194.

That the taking of the gold mine owners' right to make use of their mining properties was not in fact necessary to the successful prosecution of the war, and that the officials responsible for the issuance of L–208 either knew or should have known this fact, does not, we think, relieve the Government of its obligation to pay just compensation for the destruction of this right. The statutes and executive orders granting to the Government authority to take property which would aid in the prosecution of the war left to the discretion of those officials to whom the authority was delegated the determination of "war necessity." No tests or procedures were prescribed in connection with the making of that determination and no criteria furnished. That the determination was without foundation would be no defense in a prosecution by the Government of the owner for refusal to give up his property on the Government's demand for it accompanied by a tender of just compensation. Similarly, we think the same lack of wisdom in determining that the Government actually needed certain property which it took or destroyed would be no defense to the Government in a suit by the owner for just compensation.

That the Government did not make any physical use of the gold mines does not deprive its action of its character of a taking. The Supreme Court has held that *destruction* of private property for a *public purpose* is the equivalent of a *taking* of private property for a *public use*. United States v. Welch, 217 U.S. 333, 30 S.Ct. 527, 54 L. Ed. 787; Kimball Laundry Co. v. United States, 338 U.S. 1, 69 S.Ct. 1434, 93 L. Ed. 1765.

In concluding that L–208 amounted to a temporary taking of plaintiffs' profitable use of their mining properties for which just compensation should be paid, we have had the following considerations in mind. If L–208 had merely denied plaintiffs the right to acquire any materials, facilities or equipment needed to operate a gold mine and, as a result thereof, plaintiffs had ultimately found it necessary to cease operations because of lack of needed materials, new or repair parts, their losses would have been consequential to the exercise by WPB of its lawful regulatory power of allocation in connection with scarce materials and therefore would not have amounted to a taking. If WPB had had the power to allocate civilian manpower from and to industries, and, as a result of its allocation, plaintiffs' mines had been forced to close down, there would similarly have been no taking. If L–208 had not only denied the gold mines the right to acquire materials, equipment and facilities but had ordered the mine owners to cease using what they had on hand, to hold them for the possible use of the Government, and not to dispose of them to anyone but the Government or its designees, such an order would have amounted to a taking by the Government of those materials, facilities and equipment, whether the Government or its designees ever actually took physical possession of them or not, and the loss of the gold mine owners' ability to carry on their business would have been consequential to the taking of the materials, equipment and facilities and would not have been compensable under the Fifth Amendment.

L–208 did not do any of the above things except to deny the gold mine owners and operators the right to acquire additional materials, facilities and equipment. However, the loss of plaintiffs' right to make profitable use of their mining properties was not, in many cases, the result of that denial. The record establishes that a number of the plaintiffs herein could have operated for a time at least with what they had on hand and without acquiring any additional materials, facilities and equipment which were under Government restriction. How long they could have operated is of importance on the question of damages rather than of liability. But L–208 did not stop with a mere denial of the right to acquire materials, equipment and facilities. The real substance and intent of the order was embodied in the prohibition directed at the con-

tinued operation of the gold mines. The so-called limitation on the gold mine owners' use of the equipment and supplies and facilities which they owned was not intended to make those items available to the Government or to the war effort but was expressly included in the order to insure that they would not be used in the mining of gold, and was part and parcel of the express order to cease doing business.

We conclude that L–208 by prohibiting the carrying on of otherwise lawful mining operations placed a servitude on plaintiffs' profitable or beneficial use of their mines and thus amounted to a temporary taking of that property right in the case of those mine owners and operators who were forced to close their mines by virtue of their compliance with those provisions of L–208 which prohibited them from using their materials, facilities and equipment to mine gold and which ordered them to close down their mines. Such mine owners and operators are entitled to be paid just compensation within the meaning of the Fifth Amendment to the Constitution.

### Homestake Mining Company

The Homestake Mining Company is a California corporation. Homestake is and was in 1942 the owner of patented mining claims covering more than 5,000 acres of mining properties containing gold-bearing ores of great value located in the Black Hills area of South Dakota near the city of Lead. For some 65 years prior to October 8, 1942, Homestake had been engaged in the business of mining, processing and selling gold, and in 1942 it was the largest gold producer in the United States.

The mine was located in an isolated area and was therefore required to observe a policy of self sufficiency. From its early days it maintained larger inventories of supplies and equipment than was customary in most mining enterprises. It owned extensive timberlands which provided lumber needed for the mine. It had developed a coal mine, and it produced all of its own electric power. Prior to the issuance of L–208,

Homestake had completed two deep mine shafts and had equipped them with modern hoists. It had also erected a new lumber mill. Its steam power plant was relatively new and its ore processing mills were in excellent operating condition.

The mine maintained its own foundry and machine shops to fabricate and repair a variety of mining and processing equipment. Homestake's inventory of supplies and materials, which it could not make for itself, was sufficient in October 1942, to permit the company to operate its mine during the entire period of the closure. Dynamite, which the company would have had to obtain within a few months, was readily available without restriction.

The working and living conditions at Homestake in 1942 were superior to those of any of the nonferrous metal mines to which the Government hoped to transfer the Homestake miners. Homestake had lost some of its manpower in October 1942, but had it been permitted to continue operations it could have maintained normal production levels by using mining techniques requiring less labor and by increasing its workday from seven to eight hours.

In October 1942, the Homestake mine constituted the largest single source of potential nonferrous metal mining labor, with a total payroll of approximately 1,-800 workers of all kinds. Following the closing order, Homestake released 473 men of whom 183 were classified as miners, 39 of whom had had less than six months' experience. The nearest nonferrous metal mines were about 500 miles from the Homestake mine—Anaconda copper mine at Butte, Montana, and the Climax molybdenum mine at Climax, Colorado. Representatives of the United States Employment Service attempted to induce released Homestake workers to accept employment at those nonferrous metal mines. Fifty-one Homestake employees accepted employment at Climax, 41 staying less than 6 months and only 6 remaining as long as a year. One hundred seventy-eight Homestake employees went to Anaconda

and more than 100 left before the end of a year. Between October 8, 1942 and November 12, 1942, the United States Employment Service placed 207 Homestake employees of all kinds in other mining districts. A number of these employees, however, returned to Lead shortly after November 12, 1942.

Prior to October 8, 1942, employment at Homestake had not suffered as had employment in the nonferrous mines and, although some employees had left the mines, most of the old employees stayed on. The reasons for the greater stability of employment in this mine, which constituted the largest single source of experienced miners, were probably the good living conditions, the free medical and hospital service, group insurance, pensions, recreational and other facilities provided for Homestake employees by the company. These conditions were unusual in the mining industry and had no counterpart in the nonferrous metal mines.

After the issuance of L–208, Homestake was permitted to hoist and process ore already broken until the latter part of May 1943. After June 1, 1943, the mine was closed for all except maintenance purposes until July 1, 1945, when the mine was reopened.

Without acquiring new machinery, parts, supplies or other materials, and with a greatly reduced labor force, Homestake could have operated profitably during the entire period of closure.

Although Homestake had a large inventory of supplies and materials, and large amounts of machinery and equipment in good condition, neither WPB nor any other Government agency sought to requisition, purchase or compel the transfer thereof to the Government or to a war industry.

The properties of Homestake were useful for no other purpose than the production of gold and were adaptable to no other use than the conduct of a gold mining business. The closing of the mine had far-reaching and drastic repercussions in the city of Lead and in the surrounding communities. The pop-ulation of Lead declined sharply. More than 750 homes and apartments were left vacant and 36 business establishments which had served the communities were closed. About ten percent of the State's annual revenue derived from Homestake was lost to the State.

We conclude that L–208 amounted to a temporary taking of the profitable use of the Homestake mining properties for which Homestake is entitled to be paid just compensation within the meaning of the Fifth Amendment to the Constitution. The case will be remanded to a commissioner of the court for trial on the question of damages.

### Idaho Maryland Mines Corporation

Idaho Maryland Mines Corporation, a Nevada Corporation, owned in fee certain gold mining properties known as the Idaho Maryland Mines, consisting of approximately 8,000 acres of gold-bearing lands situated in the Grass Valley Mining District in the County of Nevada, State of California, together with all the necessary mining plant and equipment located on those lands.

On October 8, 1942, Idaho Maryland had extensive equipment and facilities for the operation of its mining enterprise, including machine shops, electric shops, welding shops, blacksmith shop, carpenter shop, cyanidation plant and smelting plant, a sawmill and other mills all the usual automotive and other equipment. It also had on hand a large inventory of supplies and materials necessary for operating the mine, including pipe and rail, steel, drill steel, tires, tubes, repair parts for milling machinery, valves, pipe fittings, mercury, etc. The mine was a fully developed one comprising extended drifts, cross-cuts raises and winzes, fully equipped with modern mechanical equipment. The mine had its own timber supply and its own sawmill. Its electric power was furnished by the Pacific Gas and Electric Company and there was no shortage of electric power at the mine nor was it curtailed during the shutdown period.

Prior to the issuance of L–208, the mine had lost considerable manpower.

Its payroll was reduced from 800 employees to 212 employees [13] between December 1941 and October 8, 1942. Alterations in mining methods enabled the mine to continue a profitable operation with the smaller force of workers.

With a greatly reduced labor force and without acquiring any critical material, supplies, equipment or facilities subject to Government control, Idaho Maryland could have operated its mining properties on a profitable basis during the entire period of L–208.

The properties of Idaho Maryland were useful for no other purpose than the production of gold. Its various machine shops were not capable of being utilized in the mass production of any item.

The closing of the mine caused considerable community dislocation and individual hardship in Grass Valley, California, which was wholly dependent upon the operation of the gold mine for its continued prosperity. Since 1848, the principal occupation of the inhabitants of the communities of Grass Valley and Nevada City had been gold mining.

On May 3, 1944, Idaho Maryland was permitted by WPB to resume operations on a limited basis to be carried out with a force not to exceed 200 men who were required to be over 40 years of age and not employed by other industries. Production was limited to 7,800 tons of ore per month, but because of the length of time it took to prepare for production and to open up the necessary ground workings after extensive damage caused by the shutdown, Idaho Maryland was not able to produce 7,800 tons a month in 1944. Permission to hire additional labor was denied by WPB on November 24, 1944.

The closing of Idaho Maryland was brought about by reason of compliance with the provisions of L–208 which ordered that the mine be closed and that the owners not use materials, supplies, machinery and facilities on hand to operate the mine. We conclude that L–208 amounted to a temporary taking of the profitable use of the Idaho Maryland mining properties for which Idaho Maryland is entitled to be paid just compensation within the meaning of the Fifth Amendment to the Constitution. The case will be remanded to a commissioner of the court for trial on the question of damages.

### Central Eureka Mining Company

Central Eureka Mining' Company, a California corporation, owned approximately 641 acres of gold-bearing land located at Sutter Creek, Amador County, California. On October 8, 1942, the mine had been producing gold for about 80 years. It then employed 117 men of whom 73 were classified as underground workers. The average age of these employees was 41.74 years. Most of them were married and had children and a number owned their own homes in the vicinity of the mine. Following the closing of the mine, the company was permitted to retain 42 men for maintenance purposes.

Central Eureka's equipment included machine shops, electrical shops, blacksmith shop, carpenter shop, an assay office, a complete mill from primary crush to cyanidation, and its own source of timber. It had all the automotive and other necessary equipment required to carry on its mining operations and the servicing of the underground workings. On October 8, 1942, the company was operating profitably and could have continued to so operate throughout the entire period of the L–208 closure without acquiring any critical materials, machinery or equipment and with a reduced force of labor. The properties of the company were useful for no other purpose than the production of gold, and were adaptable to no other use than the conduct of a gold mining business.

Following the issuance of L–208, Central Eureka attempted to operate a cop-

---

13. The average age of the 212 employees was 47.7 years. Forty-three of the underground workers were 50 years of age or over.

per mining project at Battle Mountain, Nevada, but abandoned the work in the summer of 1943. Central Eureka leased some mining equipment to individuals engaged in tungsten mining. It does not appear that any of the company's equipment or materials were ever requisitioned by the Government or acquired on mandatory orders by the Government's designees.

The closing of Central Eureka mine was brought about by compliance with the provisions of L–208 which ordered the mine to close and to cease using its materials, supplies, machinery and equipment to operate the mine. We conclude that L–208 amounted to a temporary taking of the profitable use of the mining properties of Central Eureka for which Central Eureka is entitled to be paid just compensation within the meaning of the Fifth Amendment to the Constitution. The case will be remanded to a commissioner of the court for trial on the question of damages.

*Oro Fino Consolidated Mines, Inc.*

On October 8, 1942, certain gold mining properties located in Ophir Mining District, Placer County, California, were operated by J. C. KempvanEe under lease, dated September 5, 1935, from Hazel P. Gridley. Subsequent to receipt of L–208 from WPB, the lessee was permitted by WPB to continue the removal and milling of broken ore until January 15, 1943. Thereafter, operations at the mine were discontinued and the mine closed down.

As of October 8, 1942, there were approximately 11 employees in the mine as contrasted with about 40 in normal times. The mine was equipped with the necessary machinery and equipment on October 8, 1942, but how long the mine could have continued in operation without acquiring additional materials, supplies or equipment, is not established by the record. The mine could be used for no other purpose than the production of gold, and its closing in early 1943 was due to compliance with those provisions in L–208 which ordered the mine to be closed and prohibited the operator from using materials, equipment and facilities on hand to operate the mine.

Defendant raises a special defense in this case. Defendant urges that plaintiff, Oro Fino Consolidated Mines, Inc., is not the real party in interest and that the claim, if any, with respect to the closing of the mine, resides in J. C. KempvanEe because the assignment of the lease by KempvanEe to the corporation did not include this claim. Plaintiff argues that the language of the assignment is sufficiently broad to cover the claim of KempvanEe against the United States.

The assignment, dated February 2, 1950, states that the lessee, KempvanEe

"does hereby sell, assign, transfer and grant unto Oro Fino Consolidated Mines, Inc., a corporation, all right, title and interest in and to that certain mining agreement and the real property therein described and all rights arising by virtue of said agreement, dated September 5, 1935, by and between Hazel P. Gridley, a widow, designated as lessor and J. C. KempvanEe, designated as lessee, * * *."

At the the time of the alleged taking, KempvanEe was the owner of the lease covering the mining properties and the damage, if any, was to KempvanEe. It appears that in 1948 the financial backer of KempvanEe died and he turned for financial assistance to another individual who suggested that the mining operation be incorporated. As a result, the plaintiff corporation was organized on January 4, 1950, and on February 2, 1950, KempvanEe assigned his rights in the lease to the corporation.

 We think it immaterial whether or not the somewhat ambiguous assignment conveyed to plaintiff the original lessee's right to receive just compensation or not since, if it did, the anti-assignment statute, 31 U.S.C.A. § 203, bars plaintiff's recovery. United States v. Shannon, 342 U.S. 288, 72 S.Ct. 281, 96 L.Ed. 321; Potts v. United States,

126 F.Supp. 170, 130 Ct.Cl. 88. In the Shannon case, the Shannons had purchased from the Boshamers a tract of land part of which had previously been leased by the Boshamers to the United States. Buildings on the land had been damaged by soldiers of the United States, and the contract of sale to the Shannons provided that the sellers, the Boshamers, released to the purchasers any claim, reparation, or other cause of action against the United States Government for any damage caused the property. The Boshamers were themselves unwilling to institute a claim against the United States. The Supreme Court held that the assignment of the claim fell clearly within the ban of the Anti-Assignment Act as a voluntary assignment, as distinguished from an assignment by operation of law. In the Potts case, supra, Potts held an oil and gas lease on land inundated by Lake Texoma with the building of Denison Dam. Drilling operations by Potts were damaged by the rising water in 1945. In 1950 Potts assigned the lease to Godfrey and O'Hearn. All three persons sued the United States for a taking. The Court of Claims denied the claims of Godfrey and O'Hearn, holding that whatever claim Potts may have had against the Government, he could not validly assign it to anyone.

If the assignment in evidence in this case did not convey to this plaintiff the claim of KempvanEe against the United States, plaintiff is obviously not the real party in interest. If the assignment did convey the claim, recovery is barred by the anti-assignment statute. Accordingly, the petition of Oro Fino Consolidated Mines, Inc., is dismissed.

### Alaska-Pacific Consolidated Mining Company

Alaska-Pacific Consolidated Mining Company is a State of Washington corporation owning and operating mining properties located in the Willow Creek (Wasilla) Mining District in the Territory of Alaska. The properties consisted of an underground or lode mine with amout 5 miles of underground workings and with two entries. The mine is in an isolated area and except for timber, all supplies, including foodstuffs, were imported from the States by ship, rail and truck. Because of its isolation, the mine customarily carried a substantial inventory of parts, equipment and supplies and at the time the mine was closed by virtue of L–208, Alaska-Pacific had an inventory of parts, equipment and supplies sufficient to permit continued operations for at least one and one-half years. A company village was maintained at the mine, consisting of the mine and mill buildings, various warehouses, shops, dormitories, a school and an office building, a store, messhall and various recreational facilities.

The normal crew at the mine was about 125 men. On October 8, 1942, the mine had a crew of 101 men. The only other mines in Alaska at that time, aside from gold mines, were two coal mines. Only three of Alaska-Pacific's employees had any coal mining experience. There appears to have been an aversion, at least on the part of Alaskan gold miners, to working in coal mines, partly because of the hazards involved and partly because the equipment and machinery were different. Although the record does not establish the exact number of gold miners who transferred to the two coal mines, there were at least four and possibly a few more.

Alaska-Pacific was able to produce a small amount of concentrate essential to the smelting of copper and a certain amount of tungsten. WPB was inclined to permit the mine to continue operating for the production of tungsten and, in response to a series of appeals, the mine was permitted to continue operations until August 8, 1943, on which date WPB required the mine to close down. Subsequent to the closure of the mine, Alaska-Pacific sold most of the perishable items in its inventory to such agencies as the Alaska Road Commission and the Alaska Railroad, and stored at the mine the other items.

The closing of the Alaska-Pacific mine was brought about by reason of compliance with the provisions of L–208 which ordered that the mine be closed and that the owners not use the materials, supplies, equipment and facilities on hand to operate the mine. We conclude that L–208 amounted to a temporary taking of the right of Alaska-Pacific to make profitable use of its mining properties, for which it is entitled to be paid just compensation within the meaning of the Fifth Amendment to the Constitution. The case will be remanded to a commissioner of the court for trial on the question of damages.

### Bald Mountain Mining Company

Bald Mountain Mining Company is a South Dakota corporation owning certain gold-bearing lands in Lawrence County, South Dakota. On October 8, 1942, Bald Mountain was engaged in mining gold on those properties. Pursuant to appeals to WPB, Bald Mountain was permitted to continue gold mining operations until August 8, 1943.

On October 8, 1942, Bald Mountain employed approximately 150 men. How many of these men were hardrock miners or where they went after the mine closed in August 1943, the record does not disclose.

It appears that the mine closed in August 1943, because of L–208. The mine was reopened shortly after revocation of L–208 in the summer of 1945. The record does not disclose the nature or size of the mine's inventory of mining equipment, materials and supplies on hand when the mine finally closed, or how long the mine could have continued to operate without acquiring new materials, etc.

We conclude that L–208 amounted to a temporary taking of the right of Bald Mountain to make profitable use of its mining properties for which it is entitled to be paid just compensation within the meaning of the Fifth Amendment to the Constitution. The case will be remanded to a commissioner of the court for trial on the question of damages.

In that connection, however, consideration should be given to the probable length of time Bald Mountain could have operated its mine without acquiring additional materials, facilities or equipment for which priorities were required during the period L–208 was in effect and while the mine was closed.

### Alabama-California Gold Mines Company

Alabama-California Gold Mines Company, a State of Washington corporation, owned certain gold-bearing lands located in the State of California. On August 8, 1942, Alabama-California closed its gold mine and ceased all operations because of its inability to secure sufficient manpower or materials. Inasmuch as the mine of Alabama-California was not closed by virtue of compliance with the provisions of L–208, there has been no taking of its right to make profitable use of its mining properties and the petition will therefore be dismissed.

### Consolidated Chollar Gould & Savage Mining Company

Consolidated Chollar Gould & Savage Mining Company, a California corporation, owned certain gold-bearing lands in Story County, Nevada. Its method of operation on October 8, 1942, was an open-pit one. It had explored the location and size of the veins of gold and silver through an underground shaft, but finding the cost of mining through that shaft to be excessive, it had stripped off the rock above the veins containing precious metal, and was recovering ore by use of power shovels. Some time prior to the issuance of L–208 officials of the mine had determined that because of the shortage of rubber essential to the trucking of waste from the stripping operations, the development of new ore would no longer be practicable. The mine's management had also been making preparations to conduct operations which would consist of rehandling previously mined and processed ore, and machinery was installed for this purpose.

On October 30, 1942, the company requested of WPB permission to conduct operations which would consist of the rehandling of previously mined and processed ore (tailings). It represented that such operations would require a crew of only six men who would be available from the local community and were of such an advanced age that they were precluded from employment in copper mines or defense plants. It also stated that the planned operations would require no steel consumption and that the supplies on hand and available from mines already closed down would enable the operations to be carried to completion. WPB permitted such operations to be carried on first to February 26, 1943, and then to June 30, 1943.

The above-described rehandling operations proved to be financially impractical and on April 28, 1943, Consolidated Chollar requested permission of WPB to resume its normal open-pit operations. It stated that it expected equipment to be available as a result of the completion of defense projects in the area, and that it would require no more than 20 men from the locality whose average age was over 50 years. Consolidated stated that steel consumption would be low and that it had the necessary steel on hand to operate for at least six months. Consolidated had been granted a serial number for use in its permitted rehandling operations, but on June 19, 1943, WPB refused to transfer the application of that number to the resumption of open-pit operations. Consolidated then advised WPB that there were 15 men not suitable for work in war industries available in the locality and that there were sufficient operating supplies and fabricated repair parts on hand, with the exception of sodium cyanide, for the conduct of open-pit operations for six months. It stated that if such operations were authorized, priority assistance for supplies and equipment would not be required for six months except in the event of unexpected equipment breakdown.

On August 28, 1943, WPB issued Serial No. 36–26–T under Preference Rating Order P–56 which had the result of removing this plaintiff from the restrictions of L–208, and permitted the mine to conduct open-pit operations. It was also authorized by the serial number to the use of a priority rating for obtaining maintenance, repair and operating supplies. The rating was extended through the first and second quarters of 1944.

In December 1943, Consolidated Chollar advised WPB that during the previous ninety days' operations under its serial number it had been unable to bring its operations up to capacity because of the inefficiency of available labor and the lack of adequate equipment in the form of power shovels and trucks but that it hoped this condition would improve in time. It stated that with 23 men it had been producing an average of 320 tons per day, compared with 400 tons per day in 1942, with approximately the same number of men.

The record does not disclose how long Consolidated Chollar continued open-pit operations under its serial number or its reasons for discontinuing its operations if, in fact, it did discontinue them.

The record discloses that after the war Consolidated found it necessary to first remove overburden from above the ore vein because no ore was clear for breaking. The reason for this was that during the effective period of L–208, Consolidated Chollar had been able to process all the ore which it had stripped of overburden prior to the close of 1942.

From the above, it appears that open-pit mining operations of Consolidated, in which it was engaged in October 1942, were not discontinued as a result of the issuance of L–208 except for the period from sometime in November 1942 to August 28, 1943, and during that period Consolidated was permitted to carry on the rehandling of previously mined and processed ore in accordance with plans it had made early in 1942. We conclude that while Consolidated's

operations were curtailed by WPB, they were never required to close down as provided in L–208, nor were they ever made to comply with that part of the order which prohibited the use of materials, equipment and facilities owned by them for any purpose having to do with the operation of the mine. The right of Consolidated Chollar to make profitable use of its mining properties was regulated but it was not taken or destroyed for any period and this plaintiff is accordingly not entitled to recover. The petition of Consolidated Chollar Gould & Savage Mining Company will therefore be dismissed.

### Ermont Mines, Inc.

Ermont Mines, Inc., an Oregon corporation, owned a compact block and contiguous quartz lode mining claim, designated by numbers 1 through 34 inclusive, and located in the County of Beaverhead, State of Montana.

At the time of the issuance of L–208 in October 1942, Ermont was working claims numbered 1 (with drifts on claims numbered 2, 3 and 4), 2 (working over into claim number 6), 7, 9, 19, 20, 23, 24, 28 and 32. After receiving the WPB order to close down pursuant to L–208, Ermont continued taking out ore already mined, ran it through the mill and refinery, and shipped it to the mint. Sometime in November, the mine and buildings were closed and a watchman was employed to look after the property.

On October 8, 1942, Ermont employed a crew of men adequate to work the above claims. The men had homes in the vicinity of the mine. The mine had sufficient supplies, machinery and equipment in good working order which would have enabled the mine to continue operations for at least a year from October 8, 1942, if the mine had not been closed down pursuant to L–208. Mining operations were resumed at Ermont at sometime subsequent to the revocation of L–208.

We conclude that L–208 amounted to a temporary taking (for at least one year) of the right of Ermont to make profitable use of its mining properties for which Ermont Mines, Inc., is entitled to be paid just compensation within the meaning of the Fifth Amendment to the Constitution. The case will be remanded to a commissioner of the court for trial on the question of damages.

In summary, the following plaintiffs have established their right to recover just compensation for a temporary taking of their right to make profitable use of their gold mining properties and their cases will be remanded to a commissioner of the court for trial on the question of damages: Homestake Mining Company; Idaho Maryland Mines Corporation; Central Eureka Mining Company; Alaska-Pacific Consolidated Mining Company; Bald Mountain Mining Company, and Ermont Mines, Inc. In view of our decision in these cases it is unnecessary to discuss the various contentions relative to the special jurisdictional act of July 14, 1952, 66 Stat. 605.

The petitions of Alabama-California Gold Mines Co., and Consolidated Chollar Gould & Savage Mining Company will be dismissed, inasmuch as it does not appear that they were closed down as a result of compliance with the provisions of L–208, which circumstance also removes them from any possible coverage by the special jurisdictional act.

The petition of Oro Fino Consolidated Mines, Inc., will be dismissed for the reasons set forth hereinbefore. It is so ordered.

MADDEN and WHITAKER, Judges, concur.

JONES, Chief Judge (dissenting).

I concede that that part of order L–208 which directed certain mines to be closed down was invalid. The statute did not authorize such action. Paragraph (b) (1) of that order undertook to do that and was therefore issued without authority. However, paragraphs (b) (2) and (3) of the same order, which forbade the use of critical

materials in nonessential industry, were valid exercises of the President's power under the allocation statute and they would have produced the closing down of the mines whether or not paragraph (b) (1) had been included.[1] I would hold that paragraph (b) (1) of order L–208 should therefore be construed as mere surplusage and not an exercise of the President's powers of eminent domain. Since the valid portions of the order would have produced the closing of the mines, the added part of the order becomes immaterial.

During the war limitation orders were issued to curtail or prohibit the use of critical materials in the manufacture of nonessential products. L–208(b) in its second and third paragraphs did just that. The majority concedes that such mines as did not have critical materials on hand are not entitled to recover for the reason that the gold mining process did consume critical materials and that regulations (other than L–208) depriving the operators of the effective right to acquire such materials were valid under the statute.

It follows that L–208, in so far as it prohibited the acquisition of critical materials, was valid. In so far as this order or other priority or allocation orders, either working together or separately, forbade the use of critical materials on hand for nonessential purposes, they were also valid wartime regulations. St.Regis Paper Co. v. United States, 76 F.Supp. 831, 110 Ct.Cl. 271, certiorari denied 335 U.S. 815, 69 S.Ct. 32, 93 L.Ed. 370. I do not think it matters whether the acquisition or use of critical materials was prohibited by L–208 or by it in conjunction with other priority or allocation orders.

The majority concludes that those operators who had critical materials on hand are entitled to recover for the time that these materials would have allowed them to continue operation. In this respect the court seems to rely mostly on its conclusion that in so far as L–208 prohibited the use of critical materials

on hand, it was arbitrary. The court bases this conclusion in turn primarily on the fact that the Government took no affirmative steps to allocate the materials "away from" the gold mine operators into more essential uses.

We do not think this was necessary under the circumstances. If indeed these materials were critical, then it is natural to expect that, under the operation of supply and demand, such materials would find their way into essential uses. In fact it would have been wholly impracticable in a great national emergency for any agency of government to allocate and assign every bolt, nut, and piece of critical materials. Thus, for example, even those who were engaged in essential wartime industry were often merely given priority orders which were little more than hunting licenses and these industries had the task of locating and securing the critical materials. The fact that our nation, unprepared though it was, was able to produce wartime materials on a vast scale is a magnificent tribute to our free economy.

It was reasonable to suppose that the gold mine operators would attempt to reduce their capital investment in materials which they had no authority to use. This did in fact happen in the case of the Central Eureka Mining Company which leased some of its equipment to persons engaged in tungsten mining. Thus, while it may be true that there were other motives and purposes in issuing L–208 than the allocation of critical materials, I do not think that in so far as L–208 was intended to allocate critical materials it was arbitrary. There can be no question that some strategic materials could be expected to be saved by the dual prohibition of forbidding the gold mines to acquire new strategic materials and preventing the use of the materials and equipment they had on hand.

It cannot be said that L–208 and concurrent orders in their prohibition of the use of strategic materials on hand had no reasonable relation to the execution

---

1. The full text of L–208 is set out in finding 43.

of the lawful purpose of allocating strategic materials. Jones v. City of Portland, 245 U.S. 217, 224, 38 S.Ct. 112, 62 L.Ed. 252. That this may have been done more effectively by other means does not matter.

The President had neither the constitutional power nor the statutory authority to close the mines directly. It is probable that as a legal matter the enforcement of that part of the order which directed the closing of the mines could have been enjoined. However, in wartime that is not a very practical remedy because it puts any individual or company in the position of hindering the war effort. In any event the Supreme Court has ruled that the defendant cannot be held for damages flowing from an unauthorized act of its officials. Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10. Besides, if that portion had been enjoined, the valid portions of the order, as well as concurrent orders freezing the uses of critical materials, would have remained in effect. These would have compelled the closing of the mines, and the injunction would have been useless.

There is no doubt that plaintiffs were damaged by the necessity of closing the mines. War produces many hardships. It entails many sacrifices. When ceilings are placed on the prices of the products of farm and factory, when wages are frozen and when young men are taken and sent to face hardships and even death on distant battlefields at a small rate of pay in the fixing of which they have had no part, when prices generally are fixed, when all the interests of the nation are fused in the common purpose —losses are inevitable. No nation could justify such action in normal times. It would be next to impossible to measure and pay all the losses involved in an all-out war.

If the Congress should see fit to acknowledge liability to these owners on the ground that their losses were unusual, the court should willingly undertake to determine the amount, but unless this is done I do not think the court should select these losses to be compensated.

LARAMORE, Judge (dissenting).

The majority opinion points out that L–208 was not an allocation order, as it purported to be, but rather was clearly an order closing gold mines deemed nonessential to the war effort; i. e., those mines whose gold production in dollar value exceeded 30 percent of their total production.

There was no authority vested in the President to directly close a business. The President could regulate the gold mines, allocate materials away from them, or requisition their materials, or even the business itself, if he determined their need essential for defense, and that such need was immediate and would not admit delay or resort to any other source of supply, and all other means of obtaining the use of such property for defense had been exhausted. See Act of October 16, 1941, 55 Stat. 742. Instead of determining that these gold mines were needed for defense, the President determined that they were nonessential and that the national defense would be better served by their closing.

The majority considers the closing under such circumstances to be a taking of plaintiffs' right to do business and compensable under the Fifth Amendment. I believe that the President lacked the constitutional power and statutory authority to close these mines and, therefore, the unauthorized closing could and should have been enjoined. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153.

Inasmuch as the President lacked authority to close these mines, and such closing has not been ratified by Congress, the unauthorized closing is not compensable under the Fifth Amendment. Hooe v. United States, 218 U.S. 322, 31 S.Ct. 85, 54 L.Ed. 1055; United States v. North American Transportation & Trading Company, 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935; United States v. Goltra, 312 U.S. 203, 61 S.Ct. 487, 85 L.Ed. 776.