CREECH v. UNITED STATES.
THOMAS v. SAME.

SHORE ACRES PLANTATION, Inc., v.
SAME.

Nos. 44729–44731.

Court of Claims.

Oct. 2, 1944.

Writ of Certiorari Denied June 4, 1945.

See 65 S.Ct. 1409.

894

W. H. Poe, of Orlando, Fla., for plaintiffs.

John B. Miller, of Washington, D. C., and Francis M. Shea, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and MADDEN, LITTLETON, and WHITAKER, Judges.

LITTLETON, Judge.

The claims made by plaintiffs in the petitions filed, for loss and damage to their crops in December 1937, are that during each winter season the area in question is usually and normally visited by one or more periods in which the wind blows over Lake Okeechobee from the North or Northwest at the rate of 20 to 35 miles per hour, or more, causing slight wind tides along the Southern border of the lake varying with the height of the lake and the intensity of the wind; that prior to the construction of the levee by the defendant, and at the high stages of the lake, these wind tides were dissipated after a rise of a few inches by spreading out to the old dike, and through the openings in it, and by enormous leakage through and under it, but that after the construction of said levee by defendant and the closing of the outlet channels on and after the early part of 1937, these tides, at high stages, were abruptly intercepted by the impervious levee located immediately adjacent to the lake, and rose until sufficient head was generated to produce sufficient under and lateral flow back into the body of the lake to create an equilibrium.

Further, they claim that during and prior to the winter crop season of the years 1937 and 1938 plaintiffs had provided adequate protection against a lake elevation of 17 feet, with normal wind tides as they were experienced prior to that time superadded, and had the lake elevation not exceeded 17 feet, and had the wind tides not been proportionately increased by the construction of the levee plaintiffs would not have sustained loss or damages to their crops from high water during said season.

In seeking enactment of the Special Act, quoted in finding 1, plaintiffs stated their claims to Congress in a letter of December 30, 1937, to be that "* * * the levees as established and located have left these islands wholly unprotected. * * * Properly located levees would have furnished adequate protection not only against floods from abnormal lake stages but also floods produced by wind tides at normal stages. But we do not complain of this. What we do complain of is the flood conditions produced by the levees in their present location. * * * Naturally the inquiry arises as to the manner in which these levees have caused this changed condition. * * * Before the advent of the levees wind tides would sweep on past the islands and spend themselves into these bays, pockets and marshes [lakeward of the old levee] without flooding the islands. Now the levees have cut off all of these bays, pockets and other natural outlets for wind tides. The levees stand between the shore line and the islands skirting close to the south line of Torry and Ritta Islands. One very large bay (Pelican Bay) is completely cut off."

In a further written statement filed with Congress January 14, 1938, in reply to a statement filed by the Secretary of War, plaintiffs stated with reference to their claims that "In our letter of December 30, in which the gravamen of our complaint is set forth, not one word of criticism will be found with reference to the lake elevation. Neither is there any complaint that the levees have in any manner whatsoever interfered with or prevented the control of the lake levels. * * * Our claims for damages are predicated on the position that by virtue of its location, and other natural conditions surrounding the vicinity in question, the levee causes wind tides to bank up

against it, thereby flooding the islands. In short, before the advent of the levees wind tides swept on past the islands and dissipated themselves in bays, pockets, and other natural outlets and flood conditions were not produced. Now these wind tides are impounded close to the islands, producing floods followed by enormous crop damage."

Plaintiffs press the same contentions, as set forth above, in these cases as the basis of their right to recover. In favorably reporting on the enactment of the Special Act the Claims Committees of Congress (House Report 2541, 75th Cong., 3d sess., p. 3, and Senate Report 2097, p. 3) stated, in part, that "The record is clear that wind tides and not the water level of the lake cause this [damage], * * *. Certainly they are entitled to a determination of their claims in a competent court. The facts establish more than a prima facie case but whether the Government, as a matter of law or equity, has caused the losses to claimants and ought to respond in damages therefor, is a question which we do not feel within our province to decide, particularly since we have not been called upon to do so."

From the facts established by the greater weight of the evidence of record, and set forth in the findings, we are of opinion that plaintiffs are not entitled to recover either under the Fifth Amendment or the Special Jurisdictional Act. There was no taking or intention to take plaintiffs' lands or a permanent easement thereon, i. e., the right to flood the lands during the winter months, which is a part of the season for raising crops thereon. The act of July 3, 1940, authorizing the improvements, provided "That no expense shall be incurred by the United States for the acquirement of any lands necessary for the purpose of this improvement." In addition the record shows that it was the purpose and intention of the Government to regulate the waters of Lake Okeechobee as far as possible so as to prevent the water from rising above the maximum calm water elevation of 17 feet at any time, which elevation was considerably lower than the calm water elevation which the water had customarily reached in years prior to the improvement (findings 13 and 14). In 1937, the year in question, the Government used its best efforts to regulate the water level on the basis of the formula prepared from past and existing facts and data; in

this it succeeded, and the calm water level did not rise above elevation 17.26 in the winter months of 1937. Plaintiffs suffered loss and damage to their crops in prior years from high water and wind tides. To what extent the record does not show. They claim their crops were not entirely destroyed in prior years.

On the question whether there was a taking under such circumstances as to give rise to an implied contract to pay just compensation under the Fifth Amendment, it must be held on the facts that whatever damage plaintiffs sustained as a result of the Government work was consequential and the result of authorized action of the Government in connection with navigation and flood control, for which no remedy is afforded in the courts under the Fifth Amendment. Gibson v. United States, 166 U.S. 269, 17 S.Ct. 578, 41 L. Ed. 996; Sanguinetti v. United States, 264 U.S. 146, 44 S.Ct. 264, 68 L.Ed. 608; Matthews, Trustee for R. W. Owen et al., v. United States, 87 Ct.Cl. 662, 720, 721; Poinsett Lumber & Manufacturing Co. et al. v. United States, 91 Ct.Cl. 264, 266.

Under the Special Act of June 25, 1938 (finding 1), as we interpret it, plaintiffs have not established a right to recover from the Government the damages sustained by them. This act had a purpose, and its history and language indicate that such purpose was to confer jurisdiction and authority upon the court to render judgment for the amount of damage to or loss of crops if it should be established by proof that such damage or loss in fact and in law "resulted from the construction of levees * * * and from high waters caused thereby." In other words, the damages which may be allowed are to be determined according to the usual principles of legal cause and legal liability. The act does not concede liability, and plaintiffs do not so contend.

Plaintiffs, as we understand their position in these cases, do not base any part of their claim on the fact that the maximum calm water lake elevation at the time of the damage was 17 or 17.26 feet; they base their claimed right to recover on the asserted facts that they had provided adequate equipment to protect their crops against damage from wind tides at a water elevation of 17 feet, which they expected; that the flooding which occurred as a result

896

of the 30-mile per hour northwest wind would not have occurred had the Government levee not been constructed, or if it had been constructed on the site of the old levee, and that the location of the Government levee on the lake shoreline near the islands caused this wind tide to be "six or more inches higher than before the levee was built," and that this was the cause of the loss.

These contentions present questions of fact. The entire record has been carefully studied and considered in the light of plaintiffs' exceptions and arguments, and from the oral and documentary evidence we have found that these contentions are not sustained, and that, on the contrary, the greater weight of the evidence establishes the facts that the levee, as located and constructed by the Government, had no appreciable effect on the height of the waters of the lake or on the wind tides at either Ritta or Torry Islands over and above the elevations which normally would have been occasioned under the same weather conditions without the levee (finding 22), and that none of the plaintiffs had adequate equipment in 1937 to protect their crops from loss or damage with a lake elevation of 17 feet, plus normal expected wind tides.

Plaintiffs are therefore not entitled to recover, and the petitions are dismissed. It is so ordered.

WHALEY, Chief Justice, and MADDEN and WHITAKER, Judges, concur.

JONES, Judge, took no part in the decision of this case.