## UNITED STATES *v.* CENTRAL EUREKA MINING CO. ET AL.

No. 29.   Argued January 7, 1958.—Decided June 16, 1958.

*Assistant Attorney General Doub* argued the cause for the United States.   With him on the brief were *Solicitor General Rankin, Melvin Richter, Paul A. Sweeney* and *John G. Laughlin, Jr.*

*Edward W. Bourne* argued the cause for respondents. On the brief were *Mr. Bourne, Eugene Z. Du Bose,*

*Edward E. Rigney* and *J. Kenneth Campbell* for the Homestake Mining Co., *Phillip Barnett, Ralph D. Pitt-man* and *Rodney H. Robertson* for the Central Eureka Mining Co., *O. R. McGuire, Jr.* and *V. A. Montgomery* for the Alaska-Pacific Consolidated Mining Co., *George Herrington* and *William H. Orrick, Jr.* for the Idaho Maryland Mines Corporation, and *John Ward Cutler* for the Bald Mountain Mining Co. et al., respondents.

Mr. Justice Burton delivered the opinion of the Court.

In the interest of national defense, the War Production Board, in 1942, issued its Limitation Order L–208 [1] ordering nonessential gold mines to close down. This litigation was instituted in the Court of Claims to recover compensation from the United States for its alleged taking, under such order, of respondents' rights to operate their respective gold mines. Two issues are now presented. First, whether the Act of July 14, 1952,[2] granting jurisdiction to the Court of Claims to entertain the claims arising out of L–208, was a mandate to that court to award compensation for whatever losses were suffered as a result of L–208, or whether it amounted merely to a waiver by the United States of defenses based on the passage of time. For the reasons hereafter stated, we hold that it was the latter. We, therefore, reach the second question—whether L–208 constituted a taking of private property for public use within the meaning of the Fifth

---

[1] Issued October 8, 1942, 7 Fed. Reg. 7992–7993. Amended, November 19, 1942, 7 Fed. Reg. 9613–9614; November 25, 1942, 7 Fed. Reg. 9810–9811; and August 31, 1943, 8 Fed. Reg. 12007–12008. Revoked, June 30, 1945, 10 Fed. Reg. 8110. For text of the order as issued October 8, 1942, see note 4, *infra.*

[2] The Act is set forth in the text of this opinion at p. 163, *infra.*

Amendment.[3]  For the reasons hereafter stated, we hold that it did not.

Early in 1941, it became apparent to those in charge of the Nation's defense mobilization that we faced a critical shortage of nonferrous metals, notably copper, and a comparable shortage of machinery and supplies to produce them.  Responsive to this situation, the Office of Production Management (OPM) and its successor, the War Production Board (WPB), issued a series of Preference Orders.  These gave the producers of mining machinery and supplies relatively high priorities for the acquisition of needed materials.  They also gave to those mines, which were deemed important from the standpoint of defense or essential civilian needs, a high priority in the acquisition of such machinery.  Gold mines were classified as nonessential and eventually were relegated to the lowest priority rating.  These orders prevented the mines operated by respondents from acquiring new machinery or supplies so that, by March of 1942, respondents were reduced to using only the machinery and supplies which they had on hand.

Soon thereafter, a severe shortage of skilled labor developed in the nonferrous metal mines.  This was due in part to the expanding need for nonferrous metals, and in part to a depletion of mining manpower as a result of the military draft and the attraction of higher wages paid by other industries.  It became apparent that the only reservoir of skilled mining labor was that which remained in the gold mines.  Pressure was brought to bear on the WPB to close down the gold mines with the expectation that many gold miners would thus be attracted to the nonferrous mines.

---

[3] "No person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."  U. S. Const., Amend. V.

As a part of this conservation program, WPB, on October 8, 1942, issued Limitation Order L–208 [4] now before us. That order was addressed exclusively to the gold mining industry which it classified as nonessential. It directed each operator of a gold mine to take steps immediately to close down its operations and, after seven

---

[4] War Production Board Limitation Order L–208, 7 Fed. Reg. 7992–7993, provided as follows:

"The fulfillment of requirements for the defense of the United States has created a shortage in the supply of critical materials for defense, for private account and for export which are used in the maintenance and operation of gold mines; and the following order is deemed necessary and appropriate in the public interest and to promote the national defense.

"§ 3093.1 *Limitation Order L–208*—(a) *Definitions.* For the purposes of this order, 'nonessential mine' means any mining enterprise in which gold is produced, whether lode or placer, located in the United States, its territories or possessions, unless the operator of such mining enterprise is the holder of a serial number for such enterprise which has been issued under Preference Rating Order P–56.

"(b) *Restrictions upon production.* (1) On and after the issuance date of this order, each operator of a nonessential mine shall immediately take all such steps as may be necessary to close down, and shall close down, in the shortest possible time, the operations of such mine.

"(2) In no event on or after 7 days from the issuance date of this order shall any operator of a nonessential mine acquire, consume, or use any material, facility, or equipment to break any new ore or to proceed with any development work or any new operations in or about such mine.

"(3) In no event on or after 60 days from the issuance date of this order shall any operator of a nonessential mine acquire, consume, or use any material, facility, or equipment to remove any ore or waste from such mine, either above or below ground, or to conduct any other operations in or about such mine, except to the minimum amount necessary to maintain its buildings, machinery, and equipment in repair, and its access and development workings safe and accessible.

"(4) The provisions of this order shall not apply to any lode mine

days, not to acquire, use or consume any material or equipment in development work. The order directed that, within 60 days, all operations should cease, excepting only the minimum activity necessary to maintain mine buildings, machinery and equipment, and to keep the workings safe and accessible. Applications to the

which produced 1200 tons or less of commercial ore in the year 1941, provided the rate of production of such mine, after the issuance date of this order, shall not exceed 100 tons per month, nor to any placer mine which treated less than 1000 cubic yards of material in the year 1941, provided that the rate of treatment of such placer mine, after the issuance date of this order, shall not exceed 100 cubic yards per month.

"(5) Nothing contained in this order shall limit or prohibit the use or operation of the mill, machine shop, or other facilities of a nonessential mine in the manufacture of articles to be delivered pursuant to orders bearing a preference rating of A–1–k or higher, or in milling ores for the holder of a serial number under Preference Rating Order P–56.

"(c) *Restrictions on application of preference ratings.* No person shall apply any preference rating, whether heretofore or hereafter assigned, to acquire any material or equipment for consumption or use in the operation, maintenance, or repair of a nonessential mine, except with the express permission of the Director General for Operations issued after application made to the Mining Branch, War Production Board.

"(d) *Assignment of preference ratings.* The Director General for Operations, upon receiving an application in accordance with paragraph (c) above, may assign such preference ratings as may be required to obtain the minimum amount of material necessary to maintain such nonessential mine on the basis set forth in paragraph (b)(3) above.

"(e) *Records.* All persons affected by this order shall keep and preserve, for not less than two years, accurate and complete records concerning inventory, acquisition, consumption, and use of materials, and production of ore.

"(f) *Reports.* All persons affected by this order shall execute and file with the War Production Board such reports and questionnaires as said Board shall from time to time prescribe.

"(g) *Audit and inspection.* All records required to be kept by

WPB were permitted to meet special needs and several exceptions were made under that authority. Small mines were defined and exempted from the order. The WPB did not take physical possession of the gold mines. It did not require the mine owners to dispose of any of their machinery or equipment.

On November 19, 1942, Order L–208 was amended to prohibit the disposition of certain types of machinery or

this order shall, upon request, be submitted to audit and inspection by duly authorized representatives of the War Production Board.

"(h) *Communications*. All reports to be filed, appeals, and other communications concerning this order should be addressed to: War Production Board, Mining Branch, Washington, D. C., Ref.: L–208.

"(i) *Violations*. Any person who wilfully violates any provision of this order, or who, in connection with this order, wilfully conceals a material fact or furnishes false information to any department or agency of the United States, is guilty of a crime, and upon conviction may be punished by fine or imprisonment. In addition, any such person may be prohibited from making or obtaining further deliveries of, or from processing or using, material under priority control and may be deprived of priorities assistance.

"(j) *Appeal*. Any person affected by this order who considers that compliance therewith would work an exceptional and unreasonable hardship upon him may appeal to the War Production Board, by letter, in triplicate, setting forth the pertinent facts and the reason he considers he is entitled to relief. The Director General for Operations may thereupon take such action as he deems appropriate.

"(k) *Applicability of priorities regulations*. This order and all transactions affected thereby are subject to all applicable provisions of the priorities regulations of the War Production Board, as amended from time to time.

"(P. D. Reg. 1, as amended, 6 F. R. 6680; W. P. B. Reg. 1, 7 F. R. 561; E. O. 9024, 7 F. R. 329; E. O. 9040, 7 F. R. 527; E. O. 9125, 7 F. R. 2719; sec. 2 (a), Pub. Law 671, 76th Cong., as amended by Pub. Laws 89 and 507, 77th Cong.)

"Issued this 8th day of October 1942.

"ERNEST KANZLER,
*"Director General for Operations."*

supplies without the permission of an officer of the WPB. Each mine operator was required to submit an itemized list of all such equipment held in inventory and to indicate which items he would be willing to sell or rent.[5] On August 31, 1943, L–208 was further amended to permit disposition of equipment, without approval of the WPB, to persons holding certain preference ratings.[6]   The order, thus amended, remained in effect until revoked on June 30, 1945.[7]

The first legal action against the Government arising out of L–208 was brought in the Court of Claims in 1950. It was there alleged that the order had amounted to a taking of the complainant's right to mine gold during the life of the order.   The Government demurred, taking its present position that the order was merely a lawful regulation of short supplies relevant to the war effort.   The court sustained the demurrer, holding that the damages were not compensable.   *Oro Fino Consolidated Mines, Inc.,* v. *United States,* 118 Ct. Cl. 18, 92 F. Supp. 1016.   Accord, *Alaska-Pacific Consolidated Mining Co.* v. *United States,*

---

[5] Section 6 (e), added to the original order on November 19, 1942, 7 Fed. Reg. 9613, provided:

"(e) *Restrictions on disposition of machinery and equipment.*   No person shall sell or otherwise dispose of any machinery or equipment of the types listed in Schedule A to Preference Rating Order P–56, which has been used in a nonessential mine, and no person shall accept delivery thereof, except with specific permission of the Director General for Operations.   On or before November 19, 1942, or within sixty days after the effective date, whichever is later, each operator of a nonessential mine shall file with the War Production Board, Washington, D. C., Reference: L–208, an itemized list of such machinery and equipment, signed by such operator or an authorized official, indicating each item available for sale or rental.   Upon receipt of such itemized list, the War Production Board will furnish to the operator appropriate forms to be filled out for each item which the operator desires to dispose of."

[6] 8 Fed. Reg. 12007–12008.

[7] 10 Fed. Reg. 8110.

120 Ct. Cl. 307. Somewhat later, the instant action was brought in the Court of Claims by the Idaho Maryland Mines Corporation. Relying on the *Oro Fino* decision, the Government again demurred. This time, however, the court overruled the demurrer on the ground that this complaint contained detailed allegations which, if true, in its opinion demonstrated that L–208 was an arbitrary order without rational connection with the war effort. On that basis, the court authorized a commissioner to hear this case and several similar ones, solely to determine the Goverment's liability, leaving determination of the amount of recovery, if any, to further proceedings. 122 Ct. Cl. 670, 104 F. Supp. 576.[8] The commissioner heard the cases and filed his report. The Court of Claims, with two judges dissenting, held that the six respondents now before us were entitled to just compensation. 134 Ct. Cl. 1, 53, 56, 138 F. Supp. 281, 310, 312.[9] A new trial was denied. 134 Ct. Cl. 130, 146 F. Supp. 476. We granted the Government's petition for certiorari in order to consider the important constitutional issue presented. 352 U. S. 964.

Before reaching the merits, we face the suggestion of respondents that the Special Jurisdictional Act of July 14, 1952, 66 Stat. 605, did more than waive the statute

---

[8] See also, *Homestake Mining Co.* v. *United States*, 122 Ct. Cl. 690, and *Central Eureka Mining Co.* v. *United States*, 122 Ct. Cl. 691.

[9] The Court of Claims concluded that respondents had shown not only that L–208 was arbitrary, but also that they had a sufficient inventory of machinery and supplies so that they would have been able to operate had it not been for the order. However, as to the following companies, it ordered their petitions dismissed on the ground that they had not shown that they would have been able to continue operations, thus failing to show that L–208 was the proximate cause of their loss: Alabama-California Gold Mines Co., Consolidated Chollar Gould & Savage Mining Co., and Oro Fino Consolidated Mines, Inc. 134 Ct. Cl., at 53, 138 F. Supp., at 310.

of limitations and the defense of laches. Respondents contend that this Act was a congressional mandate to the Court of Claims to award compensation to such of the respondents as established any loss which was, in fact, caused by L–208. We conclude that the language of the Act and its legislative history demonstrate that it was no more than a waiver of defenses based on the passage of time.

The entire Act reads as follows:

> "*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the United States Court of Claims be, and hereby is, given jurisdiction to hear, determine, and render judgment, notwithstanding any statute of limitations, laches, or lapse of time, on the claim of any owner or operator of a gold mine or gold placer operation for losses incurred allegedly because of the closing or curtailment or prevention of operations of such mine or placer operation as a result of the restrictions imposed by War Production Board Limitation Order L–208 during the effective life thereof: *Provided,* That actions on such claims shall be brought within one year from the date this Act becomes effective."

The Act thus contains no language prejudging the validity of the claims on their merits. On the other hand, it expressly permits the filing of actions, based on L–208, within one year from the taking effect of the Act, *"notwithstanding any statute of limitations, laches, or lapse of time . . . ."* (Emphasis supplied.) That this was the motivating purpose of Congress is further indicated by the fact that the statute of limitations had recently run against many of these claims by the time the Court of Claims, in the instant case, upheld the claim on the plead-

ings of the Idaho Maryland Mines Corporation. 122 Ct. Cl. 670, 104 F. Supp. 576. This was explained to Congress as follows in the House Report recommending passage of the bill:

"At the present time many other claimants who may have as good a right for an adjudication of their claims as does the Idaho Maryland Mines Corp. may not prosecute such claims due to the running of the statute of limitations. Many of the claimants after the ruling in the Oro Fina case undoubtedly felt that to file in the Court of Claims would be useless and, therefore, allowed the statute to run against them." H. R. Rep. No. 2220, 82d Cong., 2d Sess. 2. See also, S. Rep. No. 1605, 82d Cong., 2d Sess. 2.

The legislative history also discloses repeated failures to induce Congress to act upon the merits of the claims.[10]

---

[10] Bills were first introduced in the 78th Congress, 1st Session (1943), for the relief of the owners and operators of gold mines. Early efforts were directed at recision of L–208. H. R. 3009, 89 Cong. Rec. 6181, was referred to the House Committee on Banking and Currency and never reported out; H. R. 3682, 89 Cong. Rec. 9653, was referred to the House Committee on the Judiciary and never reported out.

At the same session of Congress, Senator McCarran introduced a bill, S. 27, 89 Cong. Rec. 34, which provided legislative relief to the mine owners vis-à-vis their creditors. This bill, referred to the Senate Committee on the Judiciary, was favorably reported, 89 Cong. Rec. 5187, S. Rep. No. 271, 78th Cong., 1st Sess., and, after amendment, it passed the Senate, 89 Cong. Rec. 6094–6095. In the House, S. 27 was referred to the House Committee on Mines and Mining, 89 Cong. Rec. 6180, and was never reported out. In the following session of Congress, a similar bill was introduced in the House by Representative Engle. H. R. 5093, 90 Cong. Rec. 6587. It too was referred to the House Committee on Banking and Currency and was never reported out.

In the 79th Congress, 1st Session (1945), Representative Engle introduced the first bill calling for compensation for losses arising out

In view of such history, it is hard to believe that the successful passage of this Act of July 14, 1952, would have taken place, as it did, without opposition [11] had it included a concession of liability. On the other hand, as explained in the above-quoted House Committee Report, its passage is readily understood if it merely granted an extension, for one year, of the time within which to file an action to recover a claim, the merits of which would be determined by the Court of Claims. For these reasons, we hold that this Jurisdictional Act is fairly interpreted as amounting only to a waiver of defenses based on the passage of time.

Turning to the merits, it is clear from the record that the Government did not occupy, use, or in any manner

of L-208. H. R. 4393, 91 Cong. Rec. 9726. This bill was referred to the House Committee on War Claims which, in turn, referred the matter to a Subcommittee. The Subcommittee held hearings over several days and issued a report to the full Committee recommending approval. (This report was quoted at length in the Reports to both Houses favoring passage of the Jurisdictional Act.) The bill was never reported out of the full Committee.

In the 81st Congress, 1st Session (1949), Senator McCarran introduced S. 45, 95 Cong. Rec. 39, substantively similar to H. R. 4393 introduced by Representative Engle. The bill was referred to the Senate Committee on the Judiciary which reported it favorably. S. Rep. No. 79, 81st Cong., 1st Sess. It was objected to, however, by Senator Donnell, 95 Cong. Rec. 2764; Senator Hendrickson, by request, *id.*, at 13297; Senator Schoeppel, *id.*, at 14722; Senator Williams, 96 Cong. Rec. 1278; Senator Hendrickson, *id.*, at 14691; and Senators Hendrickson and Williams, *id.*, at 16592, and consequently never came to a vote. In the same Congress, Representative White introduced H. R. 7851, 96 Cong. Rec. 4066, a bill of the same type, which was referred to the House Committee on the Judiciary and never reported out.

[11] The Special Jurisdictional Act was passed on the Consent Calendar. 98 Cong. Rec. 6322–6323, 8931. The seriousness of a concession of liability is evidenced by the Government's recent estimate that its potential liability, if respondents prevail, can be measured in "terms of thirty to sixty million dollars."

take physical possession of the gold mines or of the equipment connected with them. Cf. *United States* v. *Pewee Coal Co.*, 341 U. S. 114. All that the Government sought was the cessation of the consumption of mining equipment and manpower in the gold mines and the conservation of such equipment and manpower for more essential war uses. The Government had no need for the gold or the gold mines. The mere fact that L–208 was in the form of an express prohibition of the *operation* of the mines, rather than a prohibition of the use of the scarce equipment in the mines, did not convert the order into a "taking" of a right to operate the mines. Obviously, if the use of equipment were prohibited, the mines would close and it did not make that order a "taking" merely because the order was, in form, a direction to close down the mines. The record shows that the WPB expected that L–208 would release substantial amounts of scarce mining equipment for use in essential industries, and also that experienced gold miners would transfer to other mines whose product was in gravely short supply. The purpose of L–208 was to encourage voluntary reallocation of scarce resources from the unessential to the essential.

Respondents contend that L–208 was arbitrary and without rational connection with the war effort.[12] They contend that, if it were arbitrary, there is no distinction in law between this case and one where the Government consciously exercises its power to take for public use. Respondents base their assertion of arbitrariness on several circumstances. For example, they urge that the preamble to L–208 recited as its sole purpose the conservation of scarce materials. If that alone were the purpose, they contend, it had already been achieved by priority

---

[12] Ordinarily the remedy for arbitrary governmental action is an injunction, rather than an action for just compensation. *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579. Our view of the case makes it unnecessary to reach that question.

orders which prevented the gold mines from obtaining any scarce equipment. Order L–208 did more than merely prohibit the acquisition of scarce equipment—it also prohibited the use of equipment previously acquired. The fact that L–208 did not require the mine owners to sell their inventory of scarce equipment to essential users was a reasonable course of action. The WPB could properly rely on the profit motive to induce the mine owners to liquidate their inventories, and it was thought that the people who would be interested in purchasing used mining equipment probably would be the owners of essential mines. In any event, L–208 was soon amended to prohibit sales to nonessential users.[13]

Respondents also urge that the record shows that the shortage of experienced miners was the dominant, if not the sole, consideration for the issuance of L–208. They contend that the WPB had no authority to compel gold miners to transfer to other mines. The record shows that *a* dominating consideration in the issuance of L–208 was the expectation that it would release experienced miners for work in the nonferrous mines, but the record does not support a finding that such was the sole purpose of the order. It was lawful for the WPB to consider the impact of its material orders on the manpower situation. Order L–208 did not draft gold miners into government service as copper miners. It sought only to make the gold miners available for more essential work if they chose to move. Although the record indicates that the number of gold miners who transferred to nonferrous mines was disappointingly small, yet there were some who did, and others moved to other essential wartime services. The record shows a careful official consideration of the subject and a well-considered decision to accomplish a proper result. There is no suggestion that any of the officials

[13] See pp. 160–161, *supra.*

who were responsible for the order were motivated by anything other than appropriate concern for the war effort.

Thus the WPB made a reasoned decision that, under existing circumstances, the Nation's need was such that the unrestricted use of mining equipment and manpower in gold mines was so wasteful of wartime resources that it must be temporarily suspended. Traditionally, we have treated the issue as to whether a particular governmental restriction amounted to a constitutional taking as being a question properly turning upon the particular circumstances of each case. See *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 416. In doing so, we have recognized that action in the form of regulation can so diminish the value of property as to constitute a taking. *E. g., United States* v. *Kansas City Ins. Co.,* 339 U. S. 799; *United States* v. *Causby,* 328 U. S. 256. However, the mere fact that the regulation deprives the property owner of the most profitable use of his property is not necessarily enough to establish the owner's right to compensation. See *Mugler* v. *Kansas,* 123 U. S. 623, 664, 668, 669. In the context of war, we have been reluctant to find that degree of regulation which, without saying so, requires compensation to be paid for resulting losses of income. *E. g., Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146; *Jacob Ruppert* v. *Caffey,* 251 U. S. 264; *Bowles* v. *Willingham,* 321 U. S. 503; and see *United States* v. *Caltex, Inc.,* 344 U. S. 149. The reasons are plain. War, particularly in modern times, demands the strict regulation of nearly all resources. It makes demands which otherwise would be insufferable. But wartime economic restrictions, temporary in character, are insignificant when compared to the widespread uncompensated loss of life and freedom of action which war traditionally demands.

We do not find in the temporary restrictions here placed on the operation of gold mines a taking of private prop-

erty that would justify a departure from the trend of
the above decisions. The WPB here sought, by reason-
able regulation, to conserve the limited supply of equip-
ment used by the mines and it hoped that its order would
divert available miners to more essential work. Both
purposes were proper objectives; both matters were sub-
ject to regulation to the extent of the order. L–208 did
not order any disposal of property or transfer of men.
Accordingly, since the damage to the mine owners was
incidental to the Government's lawful regulation of
matters reasonably deemed essential to the war effort, the
judgment is

*Reversed.*

MR. JUSTICE FRANKFURTER, dissenting.

For losses alleged to have resulted from a wartime
order of the War Production Board, various of the re-
spondents sought monetary relief in the Court of Claims.
These suits had a checkered career in that court, and,
as a consequence, Congress passed remedial legislation
that has served as a ground for respondents' continued
assertion of their right to recover. A consideration of the
history of this controversy is necessary for due apprecia-
tion of this legislation, and an understanding of the
legislation, its background and its meaning, is essential
to a proper disposition of the suit before us.

From a time shortly before our entry into the Second
World War, gold mines in this country were subjected
by the United States Government to increasingly strin-
gent limitations on their operations. Because they were
regarded as a non-essential industry, they were first
restricted in, and then virtually excluded from, the acqui-
sition of required machinery, spare parts and supplies
that were needed in mines producing critical materials.
Finally, on October 8, 1942, apparently more in an
attempt to divert gold miners into copper mines than

(as its preamble recited) to conserve critical materials, the War Production Board issued Limitation Order L–208, 7 Fed. Reg. 7992–7993, as amended, 7 *id.*, at 9613–9614, 8 *id.*, at 12007–12008, which ordered operators of gold mines that did not also produce substantial quantities of strategic materials to cease mining operations within sixty days. This order was revoked on June 30, 1945. 10 *id.*, at 8110.

Early in 1950, one of the mine operators allegedly affected by the shutdown order brought suit against the United States in the Court of Claims, asserting that Order L–208 was issued "arbitrarily and without authority of law" and was therefore a taking of property within the meaning of the Fifth Amendment for which the claimant sought just compensation. The court, while holding that the six-year statute of limitations (28 U. S. C. § 2501) did not begin to run against the claimant until the order was rescinded, dismissed the petition for failure to state a claim under the Fifth Amendment. *Oro Fino Consol. Mines, Inc.,* v. *United States,* 118 Ct. Cl. 18, 92 F. Supp. 1016 (1950). Approximately a month before the end of the statutory period, three other mine operators filed suits in the Court of Claims, also contending that, by virtue of the WPB order, their property had been taken without just compensation in violation of the Fifth Amendment. In their complaints (as amended after the statute had run) they laid a considerably more extensive factual basis for their contentions of arbitrary and unauthorized action. The Court of Claims, in *Idaho Maryland Mines Corp.* v. *United States,* 122 Ct. Cl. 670, 104 F. Supp. 576 (1952),[1] denied the Government's motion

---

[1] That decision also governed the companion cases of *Homestake Mining Co.* v. *United States,* 122 Ct. Cl. 690, and *Central Eureka Mining Co.* v. *United States,* 122 Ct. Cl. 691.

to dismiss the suits. It distinguished *Oro Fino* on the ground that the facts there alleged in support of the contentions of unconstitutionality, by contrast with those in *Idaho Maryland,* had not been sufficient to rebut the presumption of constitutionality attaching to governmental action. A motion by the Government for rehearing was overruled two months later. *Ibid.*

Within two weeks after the *Idaho Maryland* decision Senator McCarran of Nevada introduced a bill (S. 3195, 82d Cong., 2d Sess.) to grant the Court of Claims jurisdiction, notwithstanding the statute of limitations, to hear claims of gold mine operators for losses resulting from the issuance of Order L–208. 98 Cong. Rec. 5394. After consideration of the bill, the Committee on the Judiciary on May 28, 1952, recommended "favorable consideration of the measure by the Senate" in a report, S. Rep. No. 1605, 82d Cong., 2d Sess. The report, "[i]n order that the background of this situation can be fully understood and appreciated," *id.,* at p. 2, set forth large portions of an earlier report (on H. R. 4893 of the 79th Congress) setting forth in great detail a factual basis for the following contentions:

"1. WPB Order L–208 was unique in that it was the only Government order closing a productive industry.

"2. Issuance of the order was an administrative error, based upon a statistical misconception, and may, furthermore, have been illegal.

"3. The net results of the order in accomplishing its avowed primary purpose of channeling manpower to 'essential' mines were negligible.

"4. The economic loss to the gold-mining industry has been great and in some cases the damage may be irreparable." *Id.,* at p. 3.

In the conclusion of the report, it was stated (*id.*, at p. 7) that

"The committee has carefully studied the facts relating to the situation that arose as a result of the proclamation of the War Production Board Limitation Order L–208 and is convinced that the gold mining industry was dealt with in a fashion which merits the consideration of the court in the adjudication of the losses which may have been occasioned by this order. The Idaho Maryland Mines Corp. decision is ample evidence of the fact that the least that can be done is to allow those persons affected by Order L–208 their day in court for such recompense as may seem justified."

The Senate passed the bill without debate on June 2. 98 Cong. Rec. 6322. In the House of Representatives, the bill was referred to and considered by the Committee on the Judiciary, which recommended its passage in a report (H. R. Rep. No. 2220, 82d Cong., 2d Sess.) substantially identical with the Senate report. The House passed the bill on July 2, 98 Cong. Rec. 8931, and it was signed by the President on July 14, 1952. It provides as follows:

"That the United States Court of Claims be, and hereby is, given jurisdiction to hear, determine, and render judgment, notwithstanding any statute of limitations, laches, or lapse of time, on the claim of any owner or operator of a gold mine or gold placer operation for losses incurred allegedly because of the closing or curtailment or prevention of operations of such mine or placer operation as a result of the restrictions imposed by War Production Board Limitation Order L–208 during the effective life thereof: *Provided,* That actions on such claims shall be brought within one year from the date this Act becomes effective." 66 Stat. 605.

Thereupon a number of gold mine operators brought suit in the Court of Claims, and their claims were consolidated with those involved in *Idaho Maryland* for trial on the issue of liability. These plaintiffs proceeded under alternative claims against the United States: first, that the action of the Government in ordering them to close their gold mines constituted a taking of their property that entitled them to just compensation; and, second, that the Act of July 14, 1952, created liability on the part of the Government for their provable losses resulting from the closing. The Court of Claims (two judges dissenting) decided that the closing of the mines constituted a compensable "taking" of the plaintiffs' right to operate their mines within the meaning of the Fifth Amendment. The court dealt with the statutory claim in the following terms: "In view of our decision in these cases it is unnecessary to discuss the various contentions relative to the special jurisdictional act of July 14, 1952, 66 Stat. 605." 134 Ct. Cl. 1, 53, 138 F. Supp. 281, 310 (1956).

Since a court of the United States may properly decide a constitutional question only if the case cannot fairly be disposed of on a non-constitutional basis, any statutory question that is not frivolous should be met and disposed of before questions requiring construction of the Constitution are reached. The reason for the Court of Claims' failure to heed this fundamental rule can only be surmised. This litigation was initiated before the Act of July 14, 1952, had been passed by Congress and was framed exclusively in constitutional terms. The statutory claim was injected into the litigation at a time when the court, having already handed down several decisions on the question of whether or not a claim under the Fifth Amendment had been stated, had become preoccupied with, and, therefore, oriented toward, the constitutional aspects of the claims. Understandable though this approach may be, it should not be permitted to govern

the ultimate disposition of the cases before us. In the interest of responsible administration of our constitutional system, the scope and meaning of the Act of July 14, 1952, call for determination before any decision is made as to whether or not the Government's action amounted to a "taking" within the meaning of the Fifth Amendment.

The critical question is, of course, whether the Act merely eliminates the bar of the statute of limitations or substantively establishes a congressionally acknowledged basis for recovery. On its face, the Act is readily susceptible of either interpretation. The action authorized by the statute—i. e., the filing of a certain type of suit in the Court of Claims within one year—is consistent with either of these alternative legislative ends. In order to waive the Government's then existing defense of the statute of limitations, it was necessary for Congress to authorize the assertion of claims notwithstanding the availability of that defense. And recognition by Congress of what it may regard as a just claim against the Government is not necessarily to be met by an outright appropriation to the claimants: there often remain questions (such as may be involved here, whether or not the alleged losses were caused by the Government's liability-creating action) that Congress quite properly wishes to have judicially determined before funds are to be withdrawn from the Treasury for the benefit of claimants.

Since the statutory language alone sheds little light on the congressional purpose, it is appropriate to canvass the legislative background of the Act. At the outset it should be noted that the legislative manner attending the passage of the Act has no relevance as to its interpretation. It is no more admissible that a statute's passage virtually without debate and from a bill on the consent calendar should reflect on its weight than that a decision of this Court should be given less weight because it was argued

on the summary docket. There is no reason to suppose that this legislation did not receive the careful study that the committees in their reports claim to have given it. Here one need not even draw on the indisputable fact that much legislation is passed solely on the basis of committee recommendations; the grievances of the gold mining industry had been continually pressed on Congress since shortly after the issuance of L–208,[2] so that the problem to which the Act was directed was one with which many members of Congress were undoubtedly thoroughly conversant.

Nothing is clearer from a reading of the committees' reports than that their members regarded the gold mine operators to have been unjustly treated by the Government. It is, of course, no concern of ours whether or not they were justified in thinking so. The reports quote extensively from an earlier report casting serious doubt on the propriety and even the legality of the government order and detailing the seriousness of the industry's resulting losses. To be sure, support may be drawn from this condemnation for either of the competing interpretations of the statute. It may imply a conviction that the Government should pay for whatever losses resulted from the issuance of the order; but it may also serve as nothing more than a justification for making an exception to the statute of limitations. Specific statements in the reports only compound this ambiguity. The committees make clear their concern that prospective claimants, discouraged by the *Oro Fino* decision, may have failed to assert their claims within the statutory period, discovering too late (through the *Idaho Maryland* decision) that they might have recovered. See S. Rep.

---

[2] *E. g.*, S. 27, 78th Cong.; S. 344, 78th Cong.; H. R. 3009, 78th Cong.; H. R. 3682, 78th Cong.; H. R. 5093, 78th Cong.; H. R. 4393, 79th Cong.; H. R. 950, 80th Cong.; S. 45, 81st Cong.; H. R. 7851, 81st Cong.

No. 1605, 82d Cong., 2d Sess. 2; H. R. Rep. No. 2220, 82d Cong., 2d Sess. 2. On the other hand, the committees' conclusions that "the gold mining industry was dealt with in a fashion which merits the consideration of the court in the adjudication of the losses which may have been occasioned by this order" and that "the least that can be done is to allow those persons affected by Order L–208 their day in court for such recompense as may seem justified," S. Rep. No. 1605, *supra,* at p. 7; H. R. Rep. No. 2220, *supra,* at p. 7, provide ground for inferring that Congress intended to establish a right of recovery if one did not already exist. The most, then, that can be said concerning the background of the Act is that it is inconclusive.

Although the language of the statute is equivocal and its legislative history ambiguous, another relevant line of inquiry must be pursued. The Act of July 14, 1952, is but one of many special jurisdictional statutes passed from time to time by Congress, and a number of these have been construed by the Court of Claims. An examination of these cases tends to corroborate the conclusion that the wording of the statute provides little clue to its judicially ascertainable meaning. The phrase "to hear, determine, and render judgment . . . on the claim," or an approximate equivalent, is common to most special jurisdictional statutes, including many that have been held to do no more than waive limited defenses. See, *e. g.,* Act of Sept. 25, 1950, 64 Stat. 1032, involved in *California* v. *United States,* 127 Ct. Cl. 624, 628, 119 F. Supp. 174, 177; Act of June 15, 1946, 60 Stat. 1227, involved in *Zephyr Aircraft Corp.* v. *United States,* 122 Ct. Cl. 523, 551, 104 F. Supp. 990, 997; cf. *United States* v. *Mille Lac Chippewas,* 229 U. S. 498, 500. Again, statutes similar in significant respects to the Act of July 14, 1952, have been construed in some cases to create a legal basis for recovery where none had existed before, see, *e. g.,* Act of June 14,

1935, 49 Stat. 2078, involved in *Stubbs* v. *United States,* 86 Ct. Cl. 152; Act of June 25, 1938, 52 Stat. 1399, involved in *Creech* v. *United States,* 102 Ct. Cl. 301, 60 F. Supp. 885, while in other cases to do no more than provide a forum for the adjudication of a claim on the basis of existing legal principles, see, *e. g.,* Act of May 11, 1948, 62 Stat. 1350, involved in *Hempstead Warehouse Corp.* v. *United States,* 120 Ct. Cl. 291, 98 F. Supp. 572.

In many of these special jurisdictional statutes, Congress has clarified its purpose by employing various qualifying phrases and clauses. The absence of such qualifications may be found to have some relevance in the interpretation of the statute before us. For example, where a specific defense is waived (as the statute of limitations is waived in the Act of July 14, 1952), Congress has on occasion been at pains to emphasize that the effect of the statute should extend no further than that limited waiver. See, *e. g.,* Act of Aug. 24, 1949, 63 Stat. 1169, involved in *Breinig Bros., Inc.* v. *United States,* 124 Ct. Cl. 645, 110 F. Supp. 269; Act of Oct. 18, 1951, 65 Stat. A124, involved in *Watson* v. *United States,* 135 Ct. Cl. 145, 146 F. Supp. 425. Moreover, it has not been uncommon for Congress in these statutes specifically to provide that the passage of the act should not be construed as "an inference of liability" on the part of the United States Government. See, *e. g.,* Act of July 16, 1952, 66 Stat. A206, A207, involved in *Griffith* v. *United States,* 135 Ct. Cl. 278; and Act of Aug. 25, 1950, 64 Stat. A191, involved in *Booth* v. *United States,* 140 Ct. Cl. 145, 155 F. Supp. 235.

Of course, if there is any significance to Congress' failure expressly to limit the application of the statute, it must also be recognized that Congress failed to employ techniques that would have made clear any intention to create a new right of action. Congress might, for example, have made a virtual confession of liability as

it did in the Act of March 1, 1929, 45 Stat. 2345, involved in *Garrett* v. *United States,* 70 Ct. Cl. 304. Congress might have waived other defenses than the statute of limitations. See, *e. g.,* the Act of May 28, 1928, 45 Stat. 2001, involved in *Alcock* v. *United States,* 74 Ct. Cl. 308. Or Congress might, as it has often done, spell out in detail precisely what the task of the Court of Claims is to be under the statute, making clear what issues remain to be litigated. See, *e. g.,* Act of July 2, 1956, 70 Stat. A103, involved in *Kramer* v. *United States,* 137 Ct. Cl. 537, 149 F. Supp. 152; Act of July 16, 1952, 66 Stat. A206, involved in *Griffith* v. *United States,* 135 Ct. Cl. 278; Act of March 19, 1951, 65 Stat. 5, involved in *Board of County Comm'rs* v. *United States,* 123 Ct. Cl. 304, 105 F. Supp. 995.

The Court of Claims, in seeking to determine the meaning of these statutes, has had occasion to turn to their legislative backgrounds. The court has, for example, been more readily able to find an intention on the part of Congress to admit liability where the claim in question arose out of a national emergency that had necessitated hasty and experimental governmental action resulting in disproportionate hardships, see *Nolan Bros.* v. *United States,* 98 Ct. Cl. 41, 89 (Act of July 23, 1937, 50 Stat. 533); cf. *Mansfield* v. *United States,* 89 Ct. Cl. 12 (Act of Aug. 19, 1935, 49 Stat. 2148). Significance has also been attached to the fact that Congress regarded the governmental action to have been wrongful. See *Hawkins* v. *United States,* 96 Ct. Cl. 357, 369–370 (Act of Feb. 11, 1936, 49 Stat. 2217) (statement in committee report to effect that action was "unmoral, inequitable, and unjust"). Contrariwise, however, where Congress has not made its intention quite clear, the court has approached its task with caution, see *Hempstead Warehouse Corp.* v. *United States, supra,* 120 Ct. Cl., at 305, 98 F. Supp., at 573; and it has often asserted that special jurisdictional statutes

should be strictly construed. See, *e. g., California* v. *United States, supra,* 127 Ct. Cl., at 629–630, 119 F. Supp., at 178–179; cf. *United States* v. *Cumming,* 130 U. S. 452, 455.

Thus, even this limited examination of relevant materials leaves one very much in balance. But the fact that the answer to this question is not easy is no excuse for passing over it and deciding constitutional questions. It is startling doctrine to construe the Constitution in order to avoid difficult questions of statutory interpretation. It may well be that the Court of Claims, experienced as it obviously is in interpreting such statutes as these, may find the purpose of the Act of July 14, 1952, more readily susceptible of determination than could a court not possessed of that specialized competence. When the alternatives are initial and yet final decision by this Court and decision by an experienced court with the possibility of review in this Court, the choice seems clear. I would send the case back to the Court of Claims for an authoritative construction of the Special Jurisdictional Act.

MR. JUSTICE HARLAN, dissenting.

I dissent because I believe that the Fifth Amendment to the Constitution requires the Government to pay just compensation to the respondents for the temporary "taking" of their property accomplished by WPB Order L–208.

The Court views L–208 as a normal regulatory measure of the WPB, which had authority to allocate critical materials during the late war. It holds that this was the character of the administrative Order even though the Court of Claims found that L–208 was actually designed to cause a shift of gold miners to other nonferrous metal mines, rather than to control the allocation of mining equipment in short supply, as the Order on its face purported to do. In so holding, the Court emphasizes that

the "manpower" objective was simply *one* of the purposes of L–208. I am unable to reconcile the Court's conclusions with the findings of the Court of Claims. Finding 46 of the Court of Claims states that reallocation of gold miners by forced closure of the gold mines was *"The* dominant consideration . . . in the issuance of . . . L–208." (Italics supplied.) That this finding reflected the conclusion that the "manpower" purpose was the *sole* objective of the Order seems clear from the fact that the Court of Claims struck from this finding, as submitted to it by the hearing officer, the following two sentences:

> "Another consideration in the issuance of the order was as stated in the preamble that the fulfillment of requirements for the defense of the United States had created a shortage in the supply of critical materials which had been used in the maintenance and operation of gold mines.
>
> "Both objectives [the other being "manpower"] were in some measure accomplished with the closing of the plaintiffs' gold mines pursuant to the order."

On the basis of its findings, the Court of Claims concluded in its opinion:

> "From the language of the order itself [L–208] and from the circumstances surrounding its promulgation, it is apparent that its only purpose was to deprive the gold mine owners and operators of their right to make use of their mining properties."

These conclusions, which seem to me to be convincingly supported by the evidence in the record, require that L–208 be regarded as having no other purpose than to effect the closing of respondents' mines in order to free gold mine labor for essential war work. The Government acknowledges that during the war it lacked any legal authority to order the transfer of civilian manpower.

Viewing L–208 in this light, I cannot agree with the Court's conclusion that the Order was simply a "regulation" incident to which respondents happened to suffer financial loss. Instead, I believe that L–208 effected a temporary "taking" of the respondents' right to mine gold which is compensable under the Fifth Amendment.

L–208 was the only order promulgated during World War II which by its terms required a lawful and productive industry to shut down at a severe economic cost. See S. Rep. No. 1605, 82d Cong., 2d Sess. 3. As a result of the Order the respondents were totally deprived of the beneficial use of their property. Any suggestion that the mines could have been used in such a way (that is, other than to mine gold) so as to remove them from the scope of the Order would be chimerical. Not only were the respondents completely prevented from making profitable use of their property, but the Government acquired all that it wanted from the mines—their complete immobilization and the resulting discharge of the hardrock miners. It is plain that as a practical matter the Order led to consequences no different from those that would have followed the temporary acquisition of physical possession of these mines by the United States.

In these circumstances making the respondents' right to compensation turn on whether the Government took the ceremonial step of planting the American flag on the mining premises, cf. *United States* v. *Pewee Coal Co.,* 341 U. S. 114, 116, is surely to permit technicalities of form to dictate consequences of substance. In my judgment the present case should be viewed precisely as if the United States, in order to accomplish its purpose of freeing gold miners for essential work, had taken possession of the gold mines and allowed them to lie fallow for the duration of the war. Had the Government adopted the latter course it is hardly debatable that respondents

182

would have been entitled to compensation.  See *United States* v. *Pewee Coal Co., supra.*

As the Court recognizes, governmental action in the form of regulation which severely diminishes the value of property may constitute a "taking."  See *United States* v. *Kansas City Life Ins. Co.,* 339 U. S. 799; *United States* v. *Causby,* 328 U. S. 256; *Richards* v. *Washington Terminal Co.,* 233 U. S. 546.  "The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 415.  In my opinion application of this principle calls here for the conclusion that there was a "taking," for it is difficult to conceive of a greater impairment of the use of property by a regulatory measure than that suffered by the respondents as a result of L–208.

None of the cases relied on by the Government precludes our acknowledging the confiscatory nature of L–208 and according respondents just compensation. Except in the extraordinary situation where private property is destroyed by American armed forces to meet the exigencies of the military situation in a theatre of war, see *United States* v. *Caltex, Inc.,* 344 U. S. 149, no case in this Court has held that the Government is excused from providing compensation when property has been "taken" from its owners during wartime in the interest of the common good.  Cases such as *Yakus* v. *United States,* 321 U. S. 414; *Bowles* v. *Willingham,* 321 U. S. 503; *Lichter* v. *United States,* 334 U. S. 742, involving the wartime regulation of prices, rents, and profits, are wide of the mark. In all of them the Government was administering a nationwide regulatory system rather than a narrowly confined order directed to a small, singled-out category of individual concerns.  Furthermore, none of the regulations involved in those cases prohibited the profitable exploitation of a legal business.  And in none of them

did the Government, following issuance of its edict, stand virtually in the position of one in physical possession of the property.

Also beside the point are the wartime prohibition cases. *Hamilton* v. *Kentucky Distilleries & Warehouse Co.*, 251 U. S. 146, dealt with the consequences of the Act of November 21, 1918, 40 Stat. 1045, 1046, which placed upon the property owners a burden not nearly so onerous as the one imposed on respondents by L–208. That Act permitted unrestricted sale of liquor for more than seven months from the date of its passage, and even after that time there was no restriction on sale for export or on local sale for other than beverage purposes. Moreover, the prohibition cases arose only after congressional action dealing specifically with the sale of liquor, and the Court in *Hamilton* particularly adverted to the fact that Congress might properly conclude that such sale should be halted "in order to guard and promote the efficiency" of the armed forces and defense workers. *Hamilton* v. *Kentucky Distilleries & Warehouse Co., supra,* at 155. This latter factor was also the premise of *Jacob Ruppert* v. *Caffey,* 251 U. S. 264. Not only has there been no comparable congressional finding that gold mining was injurious, but the Senate Committee on the Judiciary, which conducted a thorough analysis of the operation of L–208, recognized that "Issuance of the order was an administrative error . . . and may, furthermore, have been illegal." S. Rep. No. 1605, 82d Cong., 2d Sess. 3.

The question whether there has been a taking cannot of course be resolved by general formulae, but must turn on the circumstances of each particular case. As I have shown, the present case is plainly outside the run of past decisions. In those cases the Court was rightfully reluctant to sanction compensation for losses resulting from wartime regulatory measures which, under conditions of total mobilization, have ramifications touching everyone

in one degree or another. But where the Government proceeds by indirection, and accomplishes by regulation what is the equivalent of outright physical seizure of private property, courts should guard themselves against permitting formalities to obscure actualities. As Mr. Justice Holmes observed in *Pennsylvania Coal Co.* v. *Mahon, supra,* at 416: "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

We should treat L–208 as being what in every realistic sense it was, a temporary confiscation of respondents' property. The Government is not absolved from providing just compensation here because the WPB may have lacked authority to "take" respondents' mines in order to free the miners for essential work in other mines. See *International Paper Co.* v. *United States,* 282 U. S. 399, 406; cf. *Hatahley* v. *United States,* 351 U. S. 173. I need hardly add that we should not be deterred from according respondents their due because their claims and those of others similarly situated may run into sizable amounts. The Court of Claims, certainly not given to the easy allowance of demands upon the public treasury, faced up to what the Constitution plainly requires in this instance. We should affirm its judgment.